Opinion delivered June 24, 1887.

---

## No. 5333.

## Henry Peter *v.* The State.

1. Extra-Territorial Service of a Capias. — A capias issued by a justice of the peace of one county, for the arrest of an alleged offender, can not be legally executed in another county until the same has been endorsed as required by Articles 237 and 238 of the Code of Criminal Procedure, and, even when so endorsed, it must be executed by the proper officer of the county of the arrest.

2. Same—Manslaughter.—A killing committed in resisting arrest under an illegal process is not, ordinarily, a higher degree of homicide than manslaughter. *A fortiori*, it is impossible for a homicide to be of a degree inferior to manslaughter, if the killing is committed by one in the attempt to make an illegal arrest, though the killing may be done

upon reasonable apprehension of danger. Note the opinion for the comments of Hurt, J., on the rule, and see the opinion *in extenso* for evidence held, under the rules stated, to have been properly excluded.

3. MANSLAUGHTER—SELF DEFENSE.—See the opinion for the substance of evidence adduced upon a trial for murder, *held*, to exclude the issue of self defense.

APPEAL from the District Court of Montague. Tried below before J. W. Patterson, Esq., Special Judge.

Under an indictment charging him with the murder of Homer Crook, the appellant was convicted of manslaughter, and his penalty was assessed at a term of two years in the penitentiary.

A statement of the proof on this trial, sufficient to illustrate the rulings of this court, is contained in the opinion.

*E. C. Smith* and *W. S. Jamieson*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. Appellant was convicted of the killing of Homer Crook, the jury finding the grade of the homicide to be manslaughter, and assessing the punishment at two years confinement in the State penitentiary.

Briefly stated, the circumstances attending the homicide were that appellant, who was a constable of Denton county, was in pursuit of one Leck Crook, a brother of deceased, for whom he had a warrant issued by a justice of the peace of Wise county. About ten or eleven o'clock of the night of the homicide, appellant and others went to the house of Leck Crook's father, in Montague county, to make a search for the fugitive. The search does not appear to have been in any manner impeded by any member of the family; in fact, the father gave voluntary information leading to the recovery of a horse, which was part of the object of the search. Failing to find Leck Crook the party went into camp about half a mile distant from the searched premises.

Appellant and one Fondren went back and stationed themselves sufficiently near to the house to keep up a watch. Shortly thereafter, according to the testimony of N. B. and William Crook, the deceased, under instructions from his father, went out to see if the horses were securely tied for the night. Fol-

lowing soon thereafter the report of a gun was heard, and upon going out they found Homer Crook lying dead upon the ground, near to where the horses were tied. N. B. Crook testified that the shot was fired just as he was calling his son, the deceased.

D. C. Fondren, the only eye witness to the homicide, testified that when they saw deceased near the pen where the horses were tied, appellant said: "Yonder he is now;" that deceased "stood there a short time, and while there he was facing where we were squatted down, but in full view of where he stood; then he started in the direction of where we were, and when he advanced towards us about fifty yards defendant told him to halt, but he did not stop, and came on towards us; and after he had advanced a few steps further we told him again to halt, or hold up. As we did so he stopped and drew his hands up to about his waist; then defendant fired and deceased fell. I did not hear anybody call Homer just before the shooting; did not hear anybody about the house call any one before the shooting." He further testified that he and appellant went off rapidly in the direction of the tank without stopping to look at the body.

It was in evidence that it was a bright moonlight night, and that appellant was well acquainted with both deceased and Leck Crook; that he was on friendly visiting terms with the Crook family, they having cultivated land belonging to his father in Denton county in 1883. Also that the deceased and Leck Crook were somewhat alike in general appearance, though not of the same height and weight.

A witness who met appellant and Fondren returning to the tank just after the shooting stated that, in answer to a question from him, appellant said that he had "shot some one he supposed was Leck Crook, but was then afraid he was mistaken as to the man;" and that appellant then proceeded to detail the circumstances of the shooting substantially as given by Fondren.

The first assignment of error complains of the action of the court below in rejecting the testimony of Granville Kindred, by whom it was proposed to show that, a few days before the killing of Homer Crook, Leck Crook was confined in the jail of Denton county, of which the witness was the turnkey; that Leck assaulted and overpowered witness, taking away from him the keys and releasing himself and other prisoners, and that these acts of violence were known to appellant. The court sustained an objection to this testimony, and in this ruling we find no error. The theory upon which this assignment bases itself also

pervades several exceptions to the charges given and refused, to the extent that they may be considered together.

The defenses interposed are mistaken identity and self defense. For the purposes of this opinion the former will be considered as established, and the case will be considered as though Leck Crook had been the subject of the homicide. It will further be assumed as true that deceased, at the time the fatal shot was fired, was indicating, by some act done, a purpose to kill appellant, or do him some serious bodily harm. The question then arises, how far, under the circumstances, did the right of self defense attach?

In Ledbetter v. The State, ante, 247, it was held that a capias issued by a justice of the peace can not be executed out of his county until after endorsement as provided for in Articles 237 and 238 of the Code of Criminal Procedure; and that when so endorsed the proper officer of the county of the arrest must make the arrest. It was further held that to prevent an illegal arrest would, as a rule, be manslaughter only. Whence it follows that appellant had no authority to arrest Leck Crook in Montague county on a capias issued by a justice in Wise county; and that if the latter had killed appellant while resisting such arrest, the homicide would, under ordinary circumstances, have been certainly not of a higher grade than manslaughter. Having, then, killed Leck Crook (or his legal equivalent) in the attempt to illegally arrest him, the homicide can not be of a less grade than manslaughter, though done upon reasonable apprehension of danger.

The slayer in such case stands in the attitude of a trespasser, his situation being analogous to that of him who provokes a difficulty or furnishes the occasion therefor, in the course of which he slays his adversary to save himself; and of whom this court said in Reed v. The State (11 Texas Ct. App., 509): " If, however, he was in the wrong; if he himself was violating, or in the act of violating the law, and on account of his own wrong was placed in a situation where it became necessary for him to defend himself against an attack made upon him which was superinduced or created by his own wrong, then the law justly limits his right of self defense, and regulates it according to the magnitude of his own wrong." In King v. The State (13 Texas Ct. App., 277), this holding is again applied, and both cases, with a number of others from different States, are approvingly cited

in the recently decided Missouri case of The State v. Partlow
(S. W. Law Rep., May 16, 1887.)

Applying this doctrine—which we still hold to be the true one
—to the case before us, we are of opinion that the exclusion of
the testimony was not error; since, if admitted, it could not have
had the effect to reduce the homicide below the grade of man-
slaughter,—the grade of which appellant was convicted.   In
any event, the error, if error it was, worked no prejudice to
appellant's rights.

Cases may arise in which an original trespasser, or one who
provokes or furnishes the occasion for a difficulty, becomes en-
titled to the full and perfect benefit of self defense.   But this
right being forfeited or abridged by his own act, it must be
revived by his own act; as, where one condones his trespass or
wrong by retiring from the difficulty in an unequivocal manner,
and his adversary then renews the combat.   In such case, the
nature and character of the original trespass or provocation
enters as an element in illustrating the *animus* of the party
renewing the difficulty, and fixes the grade of the offense com-
mitted in its progress.   It will readily appear that this principle
can have no application to a case like this, where there is no
condonation or withdrawing, and where no extremity to which
the aggressor may have been put in the combat will give him
the perfect right of self defense.

The above principles and rules of law are well settled by the
decisions of this court, as well as the great weight of authority,
and a majority of this court are of opinion that the rules stated
are correct on principle and just to the accused.   The writer,
however, is of the opinion that the rules as stated above require
some modifications; but, in the light in which we view this case,
the questions are not involved, and hence I will not, at this time,
indicate the modifications deemed necessary by me.

We have conceded, for the argument, that the rights of the
appellant were precisely the same as if the deceased had been
Leck Crook, and that self defense is a question presented by
the evidence.   These concessions were simply made as a founda-
tion for a discussion of the questions above. But, let us concede
appellant had legal authority to make the arrest, and that he
was attempting to arrest Leck instead of Homer Crook.   Is
there any fact in this record presenting self defense?  It was a
bright moonlight night; deceased was about fifty yards from ap-
pellant, was unarmed, and, after being told to hold up or halt,

he advanced a few steps, drew his hands up to about his waist, all in full view of the appellant, and his associate, when he was shot down.   Now, looking to all the facts attending this homicide, we do not think that the issue of self defense is in the case presented by the evidence.   This being so, the very nice questions presented and discussed so ably by counsel for appellant are eliminated from the case, or, more properly, are not here for decision.

We very carefully examined all questions raised, and are of opinion that the record discloses no ground for a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*