(79 South. 462)

Ex parte RHODES.

RHODES v. McWILSON.

(6 Div. 732.)

(Supreme Court of Alabama.    May 30, 1918. On Application for Rehearing, June 29, 1918.)

1. SEARCHES AND SEIZURES ⬤⟹7 — ARREST WITHOUT WARRANT — "UNREASONABLE SEIZURE."

An arrest for an offense that was not committed in the presence of the arresting officer, where such officer has no cause to believe that the person arrested has committed any offense, but makes the arrest upon the mere verbal request of another citizen upon the unsworn statement that such person has committed an offense, is in violation of several sections of the Bill of Rights, being an "unreasonable seizure" within section 5, providing that "people shall be secure in their persons, * * * from unreasonable seizure," and is also in violation of Const. 1901, §§ 7 and 89.

2. MUNICIPAL CORPORATIONS ⬤⟹592(1)—ORDINANCES — CONFORMITY WITH CONSTITUTIONAL AND STATUTORY PROVISIONS.

Under Const. 1901, § 89, providing that Legislature shall not have power to authorize any municipal corporation to pass any law incon-

sistent with the general laws of the state, an ordinance authorizing an arrest without a warrant upon mere verbal request of a citizen without officer having cause to suspect commission of offense would be unconstitutional.

3. ARREST ⬤⟹63(4) — AUTHORITY TO ARREST WITHOUT WARRANT—BELIEF AS TO COMMISSION OF OFFENSE.

Under Const. 1901, § 7, providing that no person shall be arrested except in cases ascertained by law and according to the form prescribed, an arrest cannot be made without a warrant upon mere verbal request of a citizen, where officer has no cause to suspect offense has been committed.

4. CONSTITUTIONAL LAW ⬤⟹262—DUE PROCESS OF LAW—ARREST WITHOUT WARRANT.

An arrest without a warrant upon mere verbal request of a citizen, where officer has no cause to suspect commission of offense, is in violation of constitutional guaranty that no citizen shall be deprived of his liberty except by due process of law.

5. CONSTITUTIONAL LAW ⬤⟹48—VALIDITY OF STATUTES—CONSTRUCTION.

The rules of construction, whereby statutes are valid unless the court can say beyond a reasonable doubt that they are void, do not apply where inalienable rights, liberties, immunities, and privileges of the citizen are involved.

6. CONSTITUTIONAL LAW ⬤⟹38—VALIDITY OF STATUTES—RESERVED RIGHTS OF PEOPLE.

Under Bill of Rights, § 36, providing that the reserved rights of the people are excepted out of the general powers of the government and shall remain inviolate, a statute involving the inalienable rights, liberties, immunities, and privileges of the citizen is not subject to the rule of construction that a statute is valid unless expressly prohibited by state or federal Constitution.

7. ARREST ⬤⟹62 — CITY ORDINANCE — ARREST WITHOUT WARRANT—"CHARGE."

Code of City of Birmingham 1905, § 839, authorizing an arrest without a warrant of a person "against whom there is a charge made by any citizen for violating any city or state law," does not authorize an arrest on mere verbal request; the word "charge" meaning the bringing or preferring a criminal charge in the mode and form similar to that employed in preferring a charge in the justice or county court.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Charge.]

Anderson, C. J., and McClellan and Gardner, JJ., dissenting.

Certiorari to Court of Appeals.

Action by Thomas McWilson against J. Turner Rhodes. Judgment for plaintiff affirmed by Court of Appeals (16 Ala. App. 315, 77 South. 465), and defendant brings certiorari. Denied.

Horace C. Wilkinson and M. M. Ullman, both of Birmingham, for appellant.

MAYFIELD, J. To hold that the arrest in this case is lawful and reasonable is to hold that any person may be lawfully seized, arrested, detained, and, unless he give bond, imprisoned, by any policeman of the city of Birmingham, on a mere verbal request of any other citizen, who says to the policeman that the person to be arrested has violated some criminal law of this state, or some ordinance of the city of Birmingham; that such arrests may be lawfully made, as for any misdemeanor, or for the violation of any municipal ordinance of Birmingham, by any

policeman in the city of Birmingham, though the offense is not committed in the presence of the arresting officer, and though he have no probable cause to believe that that offense or any other, has been committed, and without the affidavit or oath of any person, and even when the officer and the person requesting the arrest know that the person to be arrested has committed no offense whatever, and that the arrest is for the purpose of allowing the person making the request to get possession of the property of the person arrested. That this statement is justified, see the opinion of this court on the former appeal, and that of the Court of Appeals on this appeal, as to what the undisputed evidence shows. 192 Ala. 675–682, 69 South. 69; Id., 16 Ala. App. 315, 77 South. 465.

To hold an arrest lawful and reasonable, such as is shown in the opinions to which reference is made, is in legal effect to nullify several provisions of our Bill of Rights, as well as section 89 of the Constitution.

## Opinion.

[1, 2] When the people of this state, through their representatives, met in convention to form this state government, they reserved to themselves and their descendants and successors certain rights, liberties, privileges, and immunities, which they did not surrender or cede to the government to be created by the convention. They also exacted guaranties of the government so formed to protect each person in the state, and secure to him the enjoyment and exercise of these rights, liberties, privileges, and immunities, so reserved against encroachment or destruction thereof by other persons, whether majorities or minorities of the whole, or officers of any department of the government itself. Some, but not all, of these rights, liberties, privileges, and immunities, are enumerated in the Bill of Rights, which comprises the first 36 sections of our Constitution. That all this is true is obvious from a reading of the last two sections of the Bill of Rights, as follows:

"Sec. 35. That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression.

"Sec. 36. That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this declaration of rights is excepted out of the general powers of government, and shall forever remain inviolate."

[3] The right, liberty, privilege, or immunity which is encroached upon if not destroyed by this arrest is expressly enumerated or included by implication in several sections of the Bill of Rights. Section 5 in part declares:

"That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizure or searches."

While section 7 of the Constitution in part declares:

"That no person shall be accused or arrested, or detained, except in cases ascertained by law, and according to the form which the same has prescribed."

[4] The Constitutions, state and federal, in several provisions or clauses, not only declare but guarantee that no citizen shall be deprived of his life, liberty, or property, except by due process of law. Can it be said that this plaintiff in judgment is not within the protection of these guaranties, or that no right, liberty, privilege, or immunity of his has been encroached upon, or denied him, by this arrest?

When the delegates to our first constitutional convention, who were the representatives of the people and not of the government to be created, were assembled in 1819, and were making our Constitution, there was then applicable in the Alabama territory a system of laws called "The Law of the Land," or "Due Process of Law." This consisted mainly of a great body of American laws, the American common law, together with some written laws, the acts of the Alabama and Mississippi territorial Legislatures, the Constitution of the United States, and the acts of Congress. The various phrases and clauses used by the convention to describe the reserved rights, liberties, immunities, and privileges then had well-known meanings; many of them are to be found in the Magna Charta and other charters of liberties then claimed by our ancestors as a part of the law of the land; and many of them were then imbedded in the Constitution of the United States and had been construed by the Supreme Court of our country to mean what they meant at common law. It would be unreasonable to suppose that our Constitution makers used these phrases or clauses otherwise than as then defined by the common law or the law of the land. The first clause in the fifth section of the Bill of Rights, "That the people shall be secure in their persons, houses, papers and possessions from unreasonable seizure or searches," then had a well-known meaning, and the same phrase had been often defined by the courts, state and federal. It must be presumed that the makers of the Constitution adopted it under its then construction. If it was not intended to prevent the government then being formed from authorizing or legalizing arrests like this, then the part which applies to the seizure of the person is worthless. If the arrest under consideration was lawful, or can be made so without amending the Constitution, then this guaranty of the Bill of Rights has failed of its purpose, to secure the people from unreasonable arrests. Surely the phrase "unreasonable seizure" included an arrest like the one now under consideration. If not, it would be difficult to suppose a seizure or arrest of the person that would be unreason-

able. The same is true as to the phrase "due process of law." Surely any seizure or arrest of a citizen is not reasonable, or any process is not "due process," merely because a Legislature or a municipality has attempted to authorize it. These phrases are limitations upon the power of the Legislature, as well as upon that of the other departments of government, or of their officers.

It is an error to suppose, because the last clause of section 5 of the Bill of Rights does not prohibit an arrest without a warrant, but only prohibits the issuance of a warrant without an oath or affirmation, as has been often reaffirmed and uniformly acted upon, that there is no constitutional limitation upon, or prohibition against, arrests, and that the Legislature is without limitations of its power to authorize arrests without warrant. There are other provisions in the Bill of Rights which do prohibit arrests like the one in question, one of them in the very section which prohibits the issuing of a warrant without oath or affirmation. The first clause of section 5 deals with arrests generally, and the latter clause deals with the warrant or written authority for arrests. The fact that the last clause does not condemn a given arrest, but only the issuing of the warrant, does not make it follow that other clauses of the Bill of Rights do not prohibit such arrests.

[5, 6] The general rules for the construction of statutes—that they are valid unless their prohibition can be found on the written pages of the Constitution, state or federal, and that they must be held valid unless the court can say beyond a reasonable doubt that they are void—do not apply when the reserved rights, liberties, immunities, and privileges of the citizen are involved. That is, when the inalienable rights of the citizen are involved. As section 36 of the Bill of Rights declares:

"This enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this declaration of rights is excepted out of the general powers of government, and shall forever remain inviolate."

These were therefore expressly excepted out of the general powers of the whole government—the legislative branch, as well as the executive and judicial branches. This distinction was at an early date made by this court, in the famous case of Ex parte Dorsey, reported in 7 Port. 293–419. In that case, after quoting the above section of our Bill of Rights, Justice Ormond said:

"By this it appears, not only that the rights asserted in this instrument are reserved out of the general powers of government, but also that this enumeration shall not disparage others not enumerated; and that any act of the Legislature which violates any of these asserted rights, or which trenches on any of these great principles of civil liberty, or inherent rights of man, though not enumerated, shall be void.

"It cannot, I think, be successfully maintained that this last and not least important clause of the Bill of Rights is void of meaning. Is it unreasonable to suppose that the framers of this declaration knew that the principles maintained by the immortal British judges, cited in this opinion, as well as by the jurists of our own country, had been frequently called in question; and that they intended to provide against every possible infraction of our free institutions?" Page 378.

"In ascertaining the intention of the people, in the reservation of certain great rights and privileges, we should give them a broad and liberal construction, so as to effect the manifest intention of its framers. In this there is no danger. They have asserted that they have not delegated the power to invade either of the great natural rights just cited. Does it become this court or the Legislature to quibble on its terms?" Pages 380, 381.

The same principles were again well stated by our great Chief Justice Stone, in the case of Sadler v. Langham, 34 Ala. 311. After discussing the measure of proof necessary to set aside statutes, Judge Stone said:

"Constitutional provisions are intended as a protection to life, liberty, and property, against encroachment, intentional or otherwise, at the hands of the government. Had not the framers of our system of government supposed it possible that legislative bodies might fall into error, they would not, in their sovereign capacity, have adopted a written Constitution, superior alike over themselves and the Legislature. We cannot believe that construction a sound one, which indulges every reasonable presumption against the citizen, when the Legislature deals with his rights, and gives him the benefit of every reasonable doubt, when his life and liberty are in jeopardy before the courts of the country." Page 321.

Further on in that notable opinion, treating of the provision of the Bill of Rights to the effect that the citizen shall not be deprived of his property by the government except by due process of law, even under the right of eminent domain, Justice Stone said:

"This clause in our Bill of Rights was incorporated into the fundamental law, because it was feared that all the departments of the government might fail or be unable to protect the citizens in the rightful enjoyment of their property. It implied no distrust of one department more than another, but a jealous watchfulness of individual rights, and a prudent apprehension, based on the melancholy examples furnished by the experience of mankind, that unbridled power is too apt to merge individual right in national strength and greatness. The oppressions, then fresh in their recollection, which had forced our ancestors to sever all political connection with the mother country, had taught them that the surest and best mode of installing and preserving a noble government was to enfranchise and ennoble the people, whose virtue and happiness should be the first object of all rational government." Page 327.

Surely a man's property is not more precious or sacred than his person. If the Legislature cannot deprive the citizen of his land, even when exercising the power of eminent domain, except by due process of law, surely it cannot deprive him of his liberty by authorizing his arrest upon the mere verbal request of a person who is claiming his land.

Our Constitution—especially the Bill of

Rights—is largely constituted of declarations of the common-law rights which the citizens or people then possessed, together with guaranties that these rights, privileges, and immunities shall remain inviolate, and that the government shall not usurp, destroy, or encroach thereupon. It would have been of little use, practically, to enumerate some of them, and reserve all, if the power was granted to the Legislature—one department of the government—to destroy them.

In very recent cases, these particular bills of rights, as found in our Constitution and other state Constitutions, have been uniformly construed as preserving to the citizen his common-law rights and privileges against unreasonable seizure. In one of these (Gulsby v. L. & N. R. R. Co., 167 Ala. 122, 128, 52 South. 392, 394), this court, dealing with section 5 of our Bill of Rights, said:

"In a leading and well-considered case in this country (Carey v. Sheets, 67 Ind. 375), it is said that the quoted declaration [section 5], in substance, is an affirmation of the common-law right of the citizen not to be searched or seized without probable cause."

In the Indiana case cited and approved (67 Ind. 375), it is said:

"Section 11 of the Bill of Rights * * * is but an affirmation of the common-law right of every citizen not to be searched or seized without probable cause. It affords no new right of action because of an unlawful search or seizure of the property or the person of the citizen. In its practical effect, it operates as a guaranty of the continued existence of the right which it recognizes, and as an inhibition of its abridgment by legislative authority."

The constitutional provision applies to the person, as well as to the property of the citizen; it applies to seizures, as well as to searches of either the person or property. An arrest of the person is unquestionably a seizure of the person. The citizen's person is as sacred, and needs as much protection, as his property.

It is dangerous to construe these reserved powers in Bills of Rights so as to encroach upon the liberties of the citizen, or to enlarge the powers of the government in regard thereto. This danger is well pointed out by that great judge and writer Justice Bradley, in the well-considered case of Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, dealing with the construction of two statutes, where it is said:

"Can we doubt that, when the fourth and fifth amendments to the Constitution of the United States were penned and adopted, the language of Lord Camden was relied on as expressing the true doctrine on the subject of searches and seizures, and as furnishing the true criteria of the reasonable and 'unreasonable' character of such seizures? Could the men who proposed those amendments, in the light of Lord Camden's opinion, have put their hands to a law like those of March 3, 1863, and March 2, 1867, before recited? If they could not, would they have approved the fifth section of the act of June 22, 1874, which was adopted as a substitute for the previous laws? It seems to us that the question cannot admit of a doubt. They never would have approved of them. The struggles against arbitrary power in which

they had been engaged for more than 20 years would have been too deeply engraved in their memories to have allowed them to approve of such insidious disguises of the old grievance which they had so deeply abhorred." 116 U. S. 630, 6 Sup. Ct. 532, 29 L. Ed. 746.

"Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis. We have no doubt that the legislative body is actuated by the same motives; but the vast accumulation of public business brought before it sometimes prevents it, on a first presentation, from noticing objections which become developed by time and the practical application of the objectionable law." 116 U. S. 635, 6 Sup. Ct. 535, 29 L. Ed. 746.

In the case of Pinkerton v. Verberg, 78 Mich. 573, 44 N. W. 579, 7 L. R. A. 507, 18 Am. St. Rep. 473, a woman was arrested by a policeman under the charge or claim that she was a prostitute or streetwalker, and the arrest was held to be unlawful and an unreasonable seizure of the woman; the court saying:

"The Constitution and the laws are framed for the public good, and the protection of all citizens, from the highest to the lowest; and no one may be restrained of his liberty, unless he has transgressed some law. Any law which would place the keeping and safe conduct of another in the hands of even a conservator of the peace, unless for some breach of the peace committed in his presence, or upon suspicion of felony, would be most oppressive and unjust, and destroy all the rights which our Constitution guarantees. These are rights which existed long before our Constitution, and we have taken just pride in their maintenance, making them a part of the fundamental law of the land. Whatever the charter and ordinances of the city of Kalamazoo may provide, no police officer or other conservator of the peace can constitutionally be clothed with such power as was attempted to be exercised here. No disorderly conduct; no breach of the peace, committed in the presence of the officer; no suspicion of felony, etc."

In Sarah Way's Case, 41 Mich. 304, 1 N. W. 1023, Mr. Justice Campbell, speaking upon the subject of arrest without warrant, says:

"It must not be forgotten that there can be no arrest without due process of law. An arrest without warrant has never been lawful, except in those cases where the public security requires it; and this has only been recognized in felony, and in breaches of the peace committed in the presence of the officer. Quinn v. Heisel, 40 Mich. 576, and Drennan v. People, 10 Mich. 169."

In the case of In re Kellam, 55 Kan. 700, 41 Pac. 960, the court thus states the facts:

"On August 3, 1895, Joseph S. Kellam was arrested by John M. Wilkerson, chief of police of the city of Topeka, upon a charge of selling intoxicating liquors in Topeka contrary to the city ordinances and to the laws of the state. No written complaint was ever filed, nor was there any warrant issued authorizing the arrest; but persons whom the chief of police deemed to be reliable had informed him that Kel-

lam was engaged in the unlawful sale of liquors. The chief of police had no personal knowledge that an offense had been committed; but, upon information so received, he alleged that he had reasonable suspicion that an offense had been committed, and therefore he arrested Kellam and committed him to jail."

As to the lawfulness and reasonableness of the arrest, and the validity of the statute attempting to authorize the arrest, the court said:

"The statute quoted certainly purports to give police officers power to make arrests, without warrants or other process, upon the mere suspicion that misdemeanors have been committed. But can such authority be constitutionally given? We think not. * * * In section 15 of the Bill of Rights, it is ordained that 'the right of the people to be secure in their persons and property against unreasonable searches and seizures shall be inviolate,' etc. This provision guarantees protection against unreasonable arrests, and when it was placed in the Constitution, and in fact ever since that time, an arrest for a minor offense without a warrant, and not in the view of the officer, was deemed to be unreasonable and unlawful. Under the common law, arrests without warrants were not permitted, except for offenses committed in the view of the officer; and in cases of felony actually committed the officer might also arrest without process upon a reasonable suspicion. The liberty of the citizen was so highly regarded, however, that the officer arresting the supposed felon without warrant must have acted in good faith, and upon grounds of probable suspicion that the person arrested was the actual felon." 55 Kan. 701, 702, 41 Pac. 961.

That court, in referring to a statute of the state which attempted to authorize an arrest by a policeman on the mere verbal request or complaint of another, said:

"It [the Kansas statute] is, in effect, a revival of the odious general warrants, which placed the liberty of every man in the hands of every petty officer, and which long ago received judicial condemnation. To prevent their use and the exercise of such arbitrary power at the discretion of an officer, 'it has not been deemed unwise to repeat in the state Constitutions, as well as in the Constitution of the United States, the principles already settled in the common law upon this vital point in the civil liberty.' Cooley, Const. Lim. 364, and notes.

"We readily conclude that the statute in question, which undertakes to authorize an officer to make an arrest in cases of misdemeanor without a warrant, except upon view of the offense, is unconstitutional, and for that reason the arrest of the petitioner must be held to be illegal."

To construe the charter powers of the city of Birmingham and the ordinance in question to authorize an arrest like the one in question is to render them absolutely void. They are susceptible of a construction which renders both perfectly valid, but not so as to authorize the arrest in this case. This court has expressly, and by necessary implication, construed the charter and this ordinance, or others which then stood in the place of the ones now in question, but never to authorize an arrest like that under consideration. The trial court in this case has twice construed this identical ordinance, and the Court of Appeals, once or twice, as not authorizing such arrests.

In the case of Gambill v. Schmuck, 131 Ala. 321, 31 South. 604, McClellan, C. J., writing, it was said:

"Under a general law an officer without a warrant has no authority to arrest for an offense of the grade involved here—a quasi misdemeanor—unless it is committed in his presence. Code, § 5211. And conceding for the purposes in hand, without deciding, that it was competent for the Legislature to delegate to the municipality of Birmingham the power to provide by ordinance for the arrest of misdemeanants without warrant when the offense is not committed in the presence of the arresting officer or citizen, we do not find that the Legislature has attempted to do this. What it has done is to confer upon the legislative body of the city power 'to pass all laws necessary and proper for the arrest with or without warrants of any person against whom there is a charge made by any citizen for violating any city or state law.' Having only this authority to provide for the arrest without warrant of persons against whom charges have been made by citizens, the ordinance put in evidence, which undertook to authorize such arrests in all cases regardless of charges having or not having been made, was beyond corporate capacity and void." 131 Ala. 331, 332, 31 South. 607.

In the case of Gambill v. Cargo, 151 Ala. 421, 43 South. 866, where the charter power and an ordinance thereunder were involved, (but whether the ordinance was the same as this, we are not informed), it was said per Anderson, J., now Chief Justice:

"The evidence without conflict showed that the defendant instructed Boggan 'to enforce the collection of licenses to arrest them.' See Boggan's testimony on cross-examination. Gambill also testified that Boggan had been arresting people for violating ordinances for several years, 'and that was with my knowledge, by my direction.' This evidence clearly shows that defendant had given Boggan authority to make arrests, and, if he did so wrongfully, he was nevertheless acting within the scope of his authority, and the defendant was responsible for said arrests. Whether the ordinance was valid or not we need not decide, as it was not being violated in the presence of Boggan, and he therefore had no right to arrest the defendant without a warrant. The trial court did not err in giving the general charge for the plaintiff."

Another case is that of Sanders v. Davis, 153 Ala. 375, 44 South. 979, here twice on appeal, involving the validity of an arrest by the police authorities of the city of Birmingham and, of necessity, involving the same charter provision, and some ordinance thereunder. On the last appeal, after referring to the former appeal and following that decision, it was said:

"Upon the second trial, a third count was added by amendment, which still leaves out any averment of process and arrest thereunder, but, in lieu thereof, alleges that the defendant caused 'the plaintiff to be arrested under a charge made verbally to a policeman of the city of Birmingham, Ala., on the charge of larceny.'" 153 Ala. 379, 44 South. 981.

"This extraordinary power given to officers, being in derogation of the common law, must be strictly construed. It results that the third count, which was added to the complaint in this case, was still a count for false imprisonment, and not for malicious prosecution. If the offense had been below the grade of felony, there would have been no authority under the statute to arrest without a warrant. Mitchell v. Gambill, 140 Ala. 545, 554, 37 South. 402; Gambill v. Schmuck, 131 Ala. 321, 331, 31 South. 604. So, whether the charge in this

case was grand or petit larceny, the result as to the legality or illegality of the arrest would be the same. "The ordinances of the city, which were introduced, have no bearing on this case, as the complaint does not aver an arrest under the circumstances therein provided for." 153 Ala. 382, 383, 44 South. 982.

[7] It was never intended by this charter or by this ordinance to authorize arrests on the mere verbal request of a citizen. If it was so intended, the charter and the ordinance would have said so, as did the Bessemer charter and ordinance construed in the Childers Case, 156 Ala. 96, 47 South. 70, which is in conflict with the decision in this case, and is hereby expressly overruled. The word "charge," as used in the charter and in the ordinance, was used and intended to mean what it means when it is used in the Criminal Code, as to the mode of one citizen's preferring a charge of criminal offense against another; and the charge must be preferred under the municipal law in mode and form similar to that employed to prefer a charge in the justice court, a county court, or other court having jurisdiction of the offense. Section 6703 of the Code used similar language where it says:

"A party aggrieved, or desiring to bring a charge of misdemeanor before the county court, may apply to the judge thereof, or to some justice of the peace of the county, for a warrant of arrest, and, upon making affidavit in writing that he has probable cause for believing, and does believe, that an offense (designating the misdemeanor by name, or by some other phrase which in common parlance designates it), has been committed in said county by C. D. (naming the offender) on the person (or property, as the case may be), etc."

Bringing or preferring a criminal charge, as used in the charter and in the ordinance, had a well-known meaning, and did not include a mere verbal request for an arrest or criminal prosecution. To so construe the statute and the ordinance is to uphold them; to construe them otherwise is to render them void because violative of the Constitution.

If the expression, "preferring a charge," is given the effect in the charter and the ordinance which is accorded it in the general statutes and in the Constitution, the charter and ordinance are perfectly valid—not inconsistent with the general laws—and do not deny to the citizen any right or privilege reserved by the Bill of Rights or secured to him by the common law. If they are susceptible of this construction, it should be accorded to them, rather than a construction which renders them unconstitutional and void. If the charge is made as the trial court held it should be made, and as the general law says it may be made, then the plaintiff would be "accused or arrested or detained in a case ascertained by law," that is, by the law as it was when sections 5 and 7 of the Constitution were ordained; and then the arrest or seizure would not be unreasonable, the charter power and the ordinance would both be valid; but, if one or both attempt to authorize an arrest on a mere verbal request, they are invalid. If the charge is made as the Constitution and the general laws provide, then the seizure or arrest might be valid, though the warrant issued would be void. This distinction has been well drawn by this court in several cases. In Smotherman's Case, 140 Ala. 168, 170, 171, 37 South. 376, 377, it was well pointed out as follows:

"The warrant upon which appellant was arrested was issued by a justice of the peace of Shelby county. It was addressed: 'To Any Lawful Officer of Said [Shelby] County.' The arrest was made in Jefferson county by a policeman of the city of Birmingham, and the prisoner was delivered to the warden of the city jail, by whom his body was produced before the judge of the criminal court at the hearing. This warrant of the Shelby justice was not indorsed by any magistrate of Jefferson county as required by section 5219 of the Code to give it efficacy in that county. In the absence of such indorsement, it may be conceded that as a mandate of arrest (as in and of itself conferring any authority to arrest the person named therein) this warrant was wholly inefficacious ('wholly worthless') in the county of Jefferson. Code, § 5219; Ledbetter v. State, 23 Tex. App. 247, 257 [5 S. W. 226]; Peter v. State, 23 Tex. App. 684, 687 [5 S. W. 228]; People v. Shaver, 4 Park. Crim. 45; State v. Dooley, 121 Mo. 591, 603 [26 S. W. 558]. But it by no means follows that the police officer was without authority to arrest Smotherman. To the contrary, this warrant itself, though without force as a warrant in Jefferson county, showed the existence of a fact upon which the officer was authorized by the statute to make the arrest without a warrant, namely, the fact that a charge had been made upon reasonable cause that Smotherman had committed a felony. Code, § 5211; Floyd v. State, 82 Ala. 16, 23 [2 South. 683]."

Certainly, the sections of the Bill of Rights which prohibited unreasonable seizures and arrests, and which prohibited accusations, arrests, or detentions except in cases ascertained by law, meant the law of the land as then ordained, and not any municipal law that might thereafter be ordained.

It follows that the majority of the Court of Appeals ruled correctly in holding the arrest in question unlawful and unreasonable, and that no municipal ordinance could authorize it or make it reasonable, and that the demurrers to the defendant's special pleas were properly sustained.

Application for certiorari denied.

MAYFIELD, SAYRE, SOMERVILLE, and THOMAS, JJ., concur.

McCLELLAN, J. (ANDERSON, C. J., and GARDNER, J., concurring in this dissent). The question presented for review is the validity of section 839 of the 1905 Code of the City of Birmingham. It reads:

"*Arrest Without Warrant When and by Whom Made.*—It is the duty of the chief of police and every policeman to arrest without warrant, all persons found violating any ordinance of the city, or whom he has reason to believe has violated any city ordinance, or against whom there is a charge made by any citizen for violating any city or state law, all persons found disturbing the peace by disorderly conduct, all persons found drunk on the public streets, or in any public place in the city, etc."

This ordinance was given its present amended, corrected form after the pronouncement made in Gambill v. Schmuck, 131 Ala. 331, 332, 31 South. 604. In the new charter of the city of Birmingham, approved February 23, 1899 (Weakley's Local Laws of Jefferson County, p. 164), it was provided in subdivision 25 of section 25:

"To pass all laws necessary and proper for the arrest, with or without warrants, of any person against whom there is a charge made by any citizen for violating any city or state law; to pass all laws needful for the issue and execution of such warrants."

The validity of the ordinance under consideration is pointedly sustained by the authority of Childers v. State, 156 Ala. 96, 47 South. 70. There the defendant, a police officer of the city of Bessemer, was on trial for an assault and battery "committed," to quote the statement of that case, "if at all, by making the arrest" of Louis Baggett. The defendant sought to justify through a plea asserting that he arrested Baggett on a "verbal complaint" and that "the charter of Bessemer and its ordinances authorized and empowered its police officers to arrest without warrant." The court sustained the demurrer to the plea, and this court concluded there was error in that regard and reversed the judgment. Two objections, based upon the provisions of sections 5 and 89, respectively, of the Constitution of 1901, were taken by the demurrer; and both were held to be without merit. Section 5 of the Constitution of 1901 is the same as section 7 of article 1 of the Constitution of 1868. The inhibition (section 5) was then, and is now, this:

"That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation."

In Williams v. State, 44 Ala. 41, decided in 1870, having under consideration the like provision in the Constitution of 1868, this court held that the inhibition was against the issuance of the warrant, "not arrest without warrant." The inhibition was carried forward into the Constitution of 1875; and this reordination operated to adopt as a part of the section the construction given it in 1870 in Williams v. State, supra. 11 Mich. Ala. Dig. p. 1114, where many decisions are noted. In Ex parte Thomas, 100 Ala. 102, 13 South. 517, decided in 1893, the pertinent pronouncement of the Williams Case, supra, was reaffirmed. In the full light and effect of these decisions, the Constitution of 1901 reordained in section 5 the same provisions that were considered and defined in the Williams and Thomas Cases, supra. Not since the Constitution of 1875 was adopted, with the stated explicit construction put upon it in the Williams Case, could it have been soundly insisted that the subject-matter of what is section 5 of the Constitution of 1901 applied to restrain the

otherwise unlimited legislative power to authorize arrests without warrant. In the Childers Case, itself decided nearly 10 years ago, the court but followed and applied the well-known settled law in this regard, aptly expressing the conclusion as follows:

"There being no constitutional prohibition, state or federal, it is undoubtedly within legislative competency by statute to authorize an officer to make an arrest without a warrant for either a felony or misdemeanor, whether the offense be one committed in or out of the presence of the arresting officer."

The other objection is that section 839 of the 1905 City Code of Birmingham is the product of a legislative charter (subdivision 25 of section 25, quoted ante) authorization that offends section 89 of the Constitution, which reads:

"The Legislature shall not have power to authorize any municipal corporation to pass any laws inconsistent with the general laws of this state."

The same provision was in section 50 of article 4 of the Constitution of 1875. It was considered in Ex parte Cowert, 92 Ala. 94, 100, 101, 9 South. 225, 227. The court there held, and accordingly pronounced:

"This conclusion renders it unnecessary to decide whether the General Assembly may authorize a municipal corporation, in which the general law of the state as to licensing the sale of liquors is in force, to prohibit that traffic, the general state law to the contrary notwithstanding. We are, however, of the opinion, based on exhaustive investigation and consideration, that such authorization would not be violative of article 4, § 50, of the Constitution. *We do not think the purpose or effect of that provision is, in any manner, to limit the Legislature in conferring police powers on municipal corporations.*" (Italics supplied.)

The construction there taken of section 89, or its parent in the Constitution of 1875, has not been since even qualified, much less repudiated. The identical provisions of section 50, art. 4, of the former Constitution, were reordained, as section 89, in the Constitution of 1901; whereupon the construction accorded in the Cowert Case conclusively characterizes the effect of section 89. The before-quoted provisions of the Birmingham charter are plainly referable to police power which, the court expressly decided in the Cowert Case, was not within the restriction of section 50, art. 4, now section 89 of the present organic law. In view of the established construction of section 89 of the Constitution, it is very clear and certain that section 839 of the 1905 Code of Birmingham was not invalid because the charter (subdivision 25 of section 25, ante) offended section 89 of the present organic law. As was held in the Childers Case, supra, there is nothing whatever in the Bill of Rights or elsewhere in the Constitution of 1901 that restrained or restrains the Legislature in authorizing the arrest of persons without warrant.

Aside from the provisions of section 89—which is addressed to the restraint of the Legislature, only, with respect to matters not referable to the police power—there is a

rule of restraint that inhibits municipal corporations from enacting ordinances inconsistent with state laws in virtue of charter powers that are general, not specific. The rule is thus correctly stated in Dunn v. Wilcox County, 85 Ala. 147, 4 South. 662:

"The American theory of municipalities is that the legislation permitted to be exercised by them is a mere delegation of the power of the state; and hence it is an established rule that all laws or ordinances enacted by virtue of this delegated power are, in a certain sense, as much part of the general system of legislation as are the laws of the state; and 'it is therefore necessary that they should be consistent with the state laws.' * * * It is accordingly a familiar rule on this subject that municipal by-laws and ordinances, in conflict with the general law, will be adjudged void, *unless they be clearly authorized by the charter of the particular town or city enacting them.* * * *" (Italics supplied.)

This doctrine was recently advisedly applied in Ward v. Markstein, 196 Ala. 209, 215–217, 72 South. 41. It is also announced in McQuillin on Municipal Ordinances, § 16.

In the instance now under consideration, the Legislature, through the quoted charter provision, specifically authorized the city to empower its police officers to arrest without warrant; and the ordinance (section 839) conformed, literally, to the specific charter grant. Under that specific grant, the authority to arrest without warrant was upon the condition that a "charge" should be made by "any citizen." The term "charge," as employed in the charter and in section 839 of the City Code of 1905, did not contemplate or intend a charge expressed in the form or through the method of a written information or an affidavit. The charge, within those laws, was made if advice of an offense against the laws was verbally communicated to the police officer by "any citizen." As therein used, the term signified an accusation, however communicated, by "any citizen" that a person had committed an offense against the laws mentioned in the charter (subdivision 25, § 25, of the charter). It cannot be supposed that the Legislature would authorize arrests by municipal officers, without warrant, and yet burden the purpose manifested thereby with the exaction that, to meet, would require the complaining citizen to seek out some one authorized to take affidavits who, generally, is also authorized to issue warrants for the arrest of offenders so formally accused. The legislative purpose was to afford the means for prompt arrests. This purpose would not have been accomplished if a formal, written, verified accusation had been required. Manifestly, the object intended would not have been attained. The reason inspiring the lawmakers to thus discriminatively provide is succinctly indicated in McQuillin on Municipal Ordinances, § 17, and notes.

Reference to the opinion of this court on former appeal (192 Ala. 675, 682, par. 10, 69 South. 69) discloses that the question now presented was not decided.

It is hardly necessary to add that the adoption of the Municipal Code (Pol. Code, c. 32; Acts 1907, p. 790 et seq.) did not effect the repeal of section 839 of the 1905 City Code of Birmingham. Sloss-Sheffield Co. v. Smith, 175 Ala. 260, 57 South. 29.

In my opinion the writ prayed for should be granted, the conclusion of the Court of Appeals on the question stated being laid in error.

### On Application for Rehearing.

MAYFIELD, J. The attorney for the city of Birmingham has filed an extensive brief on the application for a rehearing as amicus curiæ. He cites no statute and no ordinance, and no decision save that of Childers v. State, 156 Ala. 96, 47 South. 70 (overruled by this decision), which would authorize or justify an arrest like the one in question. The most that any of the decisions or the text-books hold is that the Legislature may authorize an officer to make an arrest for a misdemeanor committed in his presence, or on probable cause that the offense was committed. That the Legislature may, within reasonable bounds, determine what offenses are felonies, and what, misdemeanors, and what are breaches of the peace, and what, nuisances, etc. There is not to be found a single authority, decision, or text-book, in the library of this court, that sanctions the doctrine that the Legislature, a municipality, or Congress, can determine what is a "reasonable" arrest, *within the meaning of the Con*stitutions, state and federal. Those cited by counsel, as well as all others, hold that the meaning of that term, and of the phrase "due process," must be determined by what they meant at the common law, and when the Constitution was adopted. Not one of the authorities holds that an officer can legally arrest as for a past misdemeanor on the mere verbal request of a citizen, except the Childers Case. Counsel cites Williams' Case, 44 Ala. 41, and the line of cases following it. These cases do not hold, or in the opinion say aught, that would authorize or justify the arrest in this case. They say and decide only that the fifth section of the Bill of Rights does not prohibit, and was not intended to prohibit, arrests without warrant; but only to prohibit the issuance of a warrant without oath or affidavit. Neither did the common law prohibit all arrests without warrants. It only prohibited "unreasonable arrests, with or without warrants," and so does the Constitution. All the authorities, state and federal, hold that these provisions of Constitutions, and the whole of the Bill of Rights, are declaratory of the common law. The cases of Higby v. Penn. Ry., 209 Pa. 452, 58 Atl. 859, and State v. Boyd, 108 Mo. App. 518, 84 S. W. 191, only hold that stat-

utes are valid which authorize officers to make arrests for offenses committed in their presence, or on probable cause that the offense was committed, without a warrant. It is true that there are dicta, in the opinions cited by counsel, which, on casual reading, would seem to support the conclusion that the Legislature can determine what is a "reasonable arrest," and that the Legislature can authorize arrests without warrant, as for past offenses not committed in the presence of the officer; but there is no decision to that effect except the Childers Case. One of the cases most strongly relied upon by counsel is that of Burroughs v. Eastman, 101 Mich. 419, 59 N. W. 817, 24 L. R. A. 859, 45 Am. St. Rep. 419. This case is several times cited and quoted from. All that it decided was that a statute was valid which authorized an arrest without warrant for a misdemeanor committed in the presence of the officer, though the offense was not a breach of the peace.

Counsel seems to think that this Michigan case overruled the former decisions of the Michigan court. In this counsel is in error. The case did criticize what it termed "dicta," in a former case, Robison v. Miner, 68 Mich. 549, 37 N. W. 21; but it did not overrule the case, and did not even criticize the Michigan cases quoted in our decision—to the contrary, it apparently approved them. This Michigan case (101 Mich. 419, 59 N. W. 817) relied upon by counsel is reported in 24 L. R. A. 859, and 45 Am. St. Rep. 419, with notes. In the later report (45 Am. St. Rep. 419), the note consists of a dissenting opinion of the Chief Justice, concurred in by one of the Associates. In 24 L. R. A. 859, reference is made to 8 L. R. A. 529, where many authorities are collected. Instead of the early Michigan cases being overruled on the question under consideration, by the case in 101 Mich. 419, 59 N. W. 817, the very case and opinion there criticized, as to the exact point under consideration, has been reaffirmed. As late as 157 Mich. page 557, 122 N. W. 223, the case criticized in 101 Mich. 419, 59 N. W. 817, was quoted and reaffirmed, as to the exact point now under consideration. It was there said:

"The constitutional immunity from arrest is discussed by the late Mr. Justice Campbell in Robison v. Miner, 68 Mich. 557 (37 N. W. 25): 'So far as arrests are concerned, a similar principle applies. Under our system we have repeatedly decided, in accordance with constitutional principles as construed everywhere, that no arrest can be made without warrant except in cases of felony, or in cases of breaches of the peace committed in the presence of the arresting officer. This exception, in cases of breaches of the peace, has only been allowed by reason of the immediate danger to the safety of the community against crimes by violence, and it was confined, even in such cases, to instances where the violence was committed in the presence of the officer. There are not many such cases. The common and statute law provide for very few specified breaches of the peace, and there are none that are not specified. An indictment charging a person as a peacebreaker,

and not with any specified crime, would be good for nothing. Assaults and riotous conduct make up the largest part of the list. But there can be no breach of the peace within the meaning of the law that does not embrace some sort of violent as well as dangerous conduct. The manifest purpose of this statute is to bring certain things that are not breaches of the peace within that denomination to avoid the necessity of a warrant. But, as already suggested, the Constitution cannot be so evaded.'"

In a late Michigan case (121 Mich. 475, 80 N. W. 248, 46 L. R. A. 215), an opinion by the Chief Justice says:

"Officers are justified in arresting without a warrant only in cases of felony and breaches of the peace. This is elementary. It is needless to cite authorities."

Counsel also seems to think that the Supreme Court of the United States has departed from the doctrine announced in the case of Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746. That court has never departed from the construction of the fourth and fifth amendments to the federal Constitution placed thereon by Judge Bradley in Boyd's Case. It was not departed from in the case of Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652. It was only distinguished by Judge Brown from the case then in hand. It was as to the point here in question fully affirmed, and was in part quoted with approval. It has often been quoted and approved, as to its construction of both the fourth and the fifth amendments, and has never been departed from. See Rose's Notes to that decision. As late as the case of Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, Boyd's Case is accepted and quoted as to the constructions of these Bills of Rights. In that case, the opinion by Justice Day, it is said:

"The history of this amendment is given with particularity in the opinion of Mr. Justice Bradley, speaking for the court in Boyd v. United States, 116 U. S. 616 [6 Sup. Ct. 524, 29 L. Ed. 746]. As was there shown, it took its origin in the determination of the framers of the amendments to the federal Constitution to provide for that instrument a Bill of Rights, securing to the American people, among other things, those safeguards which had grown up in England to protect the people from unreasonable searches and seizures, such as were permitted under the general warrants issued under authority of the government by which there had been invasions of the home and privacy of the citizens and the seizure of their private papers in support of charges, real or imaginary, made against them.

"In the Boyd Case, supra, after citing Lord Camden's judgment in Entick v. Carrington, 19 Howell's State Trials, 1029, Mr. Justice Bradley said (116 U. S. 630 [6 Sup. Ct. 532, 29 L. Ed. 746]): 'The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right

has never been forfeited by his conviction of some public offense—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment.'

"In Bram v. United States, 168 U. S. 532, 544 [18 Sup. Ct. 183, 42 L. Ed. 568], this court in speaking by the present Chief Justice of Boyd's Case, dealing with the fourth and fifth amendments, said: 'It was in that case demonstrated that both of these amendments contemplated perpetuating, in their full efficacy, by means of a constitutional provision, principles of humanity and civil liberty, which had been secured in the mother country only after years of struggle, so as to implant them in our institutions in the fullness of their integrity, free from the possibilities of future legislative change.'

"The effect of the fourth amendment is to put the courts of the United States and federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure to the people their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law.

"In Adams v. New York, 192 U. S. 585 [24 Sup. Ct. 372, 48 L. Ed. 575], this court said that the fourth amendment was intended to secure the citizen in person and property against unlawful invasion of the sanctity of his home by officers of the law acting under legislative or judicial sanction. This protection is equally extended to the action of the government and officers of the law acting under it. Boyd's Case, supra. To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action."

In the case of South Carolina v. United States, 199 U. S. 437, 26 Sup. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737, Boyd's Case is approved and quoted, and in addition it is said:

"The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now. Being a grant of powers to a government, its language is general, and, as changes come in social and political life, it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words, while the powers granted do not change, they apply from generation to generation to all things to which they are in their nature applicable. This in no manner abridges the fact of its changeless nature and meaning. Those things which are within its grants of power, as those grants were understood when made, are still within them, and those things not within them remain still excluded. As said by Mr. Chief Justice Taney in Dred Scott v. Sandford, 19 How. 393, 426 [15 L. Ed. 691]: 'It is not only the same in words, but the same in meaning, and delegates the same powers to the government, and reserves and secures the same rights and privileges to the citizens; and, as long as it continues to exist in its present form, it speaks, not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court and make it the mere reflex of the popular opinion or passion of the day.'

"It must also be remembered that the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men, dealing with the facts of political life as they understood them, putting into form the government they were creating, and prescribing in language clear and intelligible the powers that government was to take. Mr. Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. 1,

188 [6 L. Ed. 23], well declared: 'As men whose intentions require no concealment generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.'

"One other fact must be borne in mind, and that is that in interpreting the Constitution we must have recourse to the common law."

Another case much relied upon by counsel is that of B. & O. R. R. Co. v. Cain, 81 Md. 87, 31 Atl. 801, 28 L. R. A. 688. That is a Maryland decision. It construes no statute or ordinance, but merely holds that the legality of the arrest in that case was a question for the jury, where there was evidence to show that the party arrested was drunk and disorderly on a car full of passengers and ladies. This arrest was perfectly valid at common law; it was, as Mr. Freeman points out in a note, merely turning over the party by the conductor to the police officer. It is thus referred to by Mr. Freeman in a note (84 Am. St. Rep. 688). There is nothing in the Maryland opinion contrary to our holding. In the extended note to the case of State v. Evans, 161 Mo. 95, 61 S. W. 590, 84 Am. St. Rep. 669. Many, if not all, the cases up to that date are referred to, and some of them are quoted with approval. See note, 84 Am. St. Rep. 679.

In Wisconsin, it was decided that an arrest by an officer, without a warrant, for a misdemeanor not committed in his presence, was illegal, even if there was an ordinance attempting to authorize such an arrest. Stittgen v. Rundle, 99 Wis. 78, 74 N. W. 536.

In an Illinois case that court said:

"A city marshal or other police officer has no power to arrest for a misdemeanor or a violation of an ordinance unless the offense is actually committed; and when called upon to justify the arrest he must be able to show the offense was committed in his presence. Shanley v. Wells, 71 Ill. 78; North v. People, 139 Ill. 81 [28 N. E. 966]; Lynn v. People, 170 Ill. 527 [48 N. E. 964]; Wide v. C. & N. W. Ry. Co., 93 Ill. App. 266. In an action for trespass and false imprisonment, probable cause and the absence of malice constitute no defense. There must be an existing legal cause for the arrest, and that cause must be a law violated. Such a form of action must be distinguished from an action for malicious prosecution. Hight v. Naylor, 86 Ill. App. 508; Johnson v. Von Kettler, 84 Ill. 315; Shanley v. Wells, 71 Ill. 78; Coffman v. Burkhalter, 98 Ill. App. 304. In this form of an action, belief in the guilt of the party arrested, no matter how strong or well founded in the mind of the officer or person making the arrest, will not justify the deprivation of another of his liberty." Markey v. Griffin, 109 Ill. App. 219.

The Illinois case cited by counsel (254 Ill. 624, 98 N. E. 999, Ann. Cas. 1913B, 1058) only holds that a statute may authorize a conductor to arrest persons who are drunk or boisterous on the train. There, the offense was committed in the presence of the officer whom the statute authorized to make the arrest. Counsel cites 1 Bishop on Criminal Procedure, 167, 168. This authority is against the insistence of counsel, and holds

with the opinion. Mr. Bishop, after stating specific cases in which arrests as for misdemeanors can be made without warrant, says:

"After the tumult is over, with no prospect of its renewal, it is too late to interfere without judicial process. And other past misdemeanors are within the same rule, namely, that a private person, or even an officer, cannot without a warrant arrest one for a misdemeanor committed on an occasion already passed." 1 Bish. Crim. Proced. §§ 166, 167, p. 94.

Then, after enumerating the officers who may make arrests, this author says:

"For a past offense below felony, none of these officers can arrest without a warrant; unless, for example, it is an assault liable to end in felony by the death of the injured person."