(89 South. 179)

### STATE TAX COMMISSION v. TENNESSEE COAL, IRON & R. CO. et al.
### (6 Div. 393.)

(Supreme Court of Alabama.    June 16, 1921. Rehearing Denied July 8, 1921.)

1. **Taxation ⬳452—Revenue Act of 1919 did not impliedly repeal Code section, requiring notice of revaluation.**

The Revenue Act of 1919, though it purports to be a complete revision of the tax laws and to cover the entire subject, did not impliedly repeal Code 1907, § 2228, requiring the Tax Commission to give notice to a taxpayer of a hearing for revaluation of the property, since the Legislature is presumed to have known of a decision that such notice was essential to the validity of a revaluation, and that the Code provision was not repealed by the Revenue Act 1915, so that it will not be presumed the Legislature intended to repeal it, in the absence of any provision in the act of 1919 requiring notice of revaluation, and therefore section 138, par. "m," Act of 1919, authorizing revaluation, is not void because it requires no notice to the taxpayer.

2. **Taxation ⬳58—Clause repealing conflicting laws indicates act was not intended to be exclusive.**

The repealing clause of Revenue Act 1919, expressing the legislative intent to repeal only so much of previous enactments as are in conflict therewith, thereby indicates that it was not intended as a complete and exclusive act in and of itself.

3. **Taxation ⬳476—Revaluation by Tax Commission should be made in county where property is.**

Though Revenue Act 1919, § 138, par. "m," authorizing revaluation by the State Tax Com-

mission, does not prescribe the place where the hearing for revaluation shall be held, Code 1907, § 2228, requiring notice of a hearing for revaluation, manifests that the hearing should be in the county in which the property to be reassessed is situated, so that the Tax Commission cannot, under the authority given by sections 21, 148, 417, require the taxpayer to bring its books and papers to the State Capitol for examination to aid in making the revaluation.

4. **Mandamus ⬳163 — Inclusion of improper demands does not make whole petition bad.**

The fact that a petition for mandamus contains some demands which are too general and some demands to which petitioner is not entitled does not make the whole petition bad on demurrer, directed against the whole relief sought, and not merely against the relief as to which the allegations of the petition are insufficient.

5. **Witnesses ⬳16—Fact that duces' tecum was too broad does not relieve party from responding thereto.**

The fact that duces tecum was broader than it should have been does not relieve the parties from responding thereto or from the contempt for failure to do so.

Gardner and Sayre, JJ., dissenting.

Appeal from Circuit Court, Jefferson County; Richard Evans, Judge.

Application by the State Tax Commission for mandamus, directed to the Tennessee Coal, Iron & Railroad Company and its governing officers, to compel them to submit certain books, papers, and other documents to the State Tax Commission or its duly authorized agents. From a decree sustaining demurrers to the petition, petitioners appeal. Reversed, rendered, and remanded.

The petition was filed by the members of the State Tax Commission in their official capacity and by the State Tax Commission asserting that the Commission or the officials thereof required information which would be disclosed by the books, records and documents in the possession and control of the corporation and the individual respondent as officers thereof, which information was necessary and material for the petitions to have in order to the proper performance of their duties as commissioners under the act approved September 15, 1919 (Laws 1919, p. 282). The petitioners based their right upon certain specific provisions of the act, and assert that mandamus is necessary in order to obtain the information and for the procurement of and inspection of said books documents and records, or that if they are mistaken in this they are entitled to proceed under certain provisions of the act itself against the individual respondents as officers of the corporation as provided by section 148 of the act. Petition avers in substance that the respondent corporation is engaged in the business of mining coal and iron ore and manu-

facturing and selling the same and the products thereof; manufacturing steel and the products thereof; owning lands and interest in lands for that purpose amounting to 170,000 acres containing coal, iron ore, and other minerals, and that the corporation is actively operating its mines on a very large scale, and that its manufacturing establishment consists of furnaces, rolling mills, mines, quarries, and other manufacturing establishments of various kinds, together with the machinery, and ordinary appliances used in such business, all of great value, to wit, from $30,000,000 to $50,000,000, on which the corporation is liable to taxation by the state, not only on the value of such physical properties, but for a franchise tax, based on the actual amount of capital employed by it in the state and on all goods, wares, stocks, and merchandise, and also for tonnage tax on coal and iron per ton mined by it for each preceding month.

The petition sets up two main grounds as bases for its authority and right to obtain the information sought: First, under the general and continuous duties required of it by said act, to see that proper values are obtained as a basis for taxation, that the burden of taxation be justly equalized, without discrimination throughout the state and each taxing community thereof; second, that as to the respondent corporation upon its listed return of items of property for taxation, made to the tax assessor of Jefferson county, the local board of tax adjusters of said county made a preliminary or provisional assessment on values estimated by them, without sufficient or accurate knowledge of such values having been first obtained, and that, acting under the authority of the statute, the State Tax Commission has set aside and annulled such provisional assessment as authorized by said act, having previously thereto made request of respondent corporation for permission to inspect and examine its books, which request was denied, and that thereafter such Tax Commission proceeded to take the necessary lawful steps to procure said information by the issuance of a subpœna duces tecum, regularly issued and served upon said corporation and its said officers, to produce before it, at its office in the city of Montgomery, on November 16, 1921, certain books, documents, and records, specifically set forth in each separate paragraph of each said subpœna duces tecum (copy of which is attached later) as authority for requiring the production and inspection of these books, papers, and records, petitioners refer to sections 138, 148, 21, and 417 of said act particularly, and also refer to the act as a whole. The petition also sets up by a statement of facts that access to the books and records kept and used by respondent in the conduct of its manifold business is necessary to the ascertainment of the facts and elements of value which enter into the assessment of taxes on the respondent in Jefferson county. All of which is verified by the oath of petitioner.

The subpœna of duces tecum is as follows:

"The following described books, documents, records, and papers which are in his custody and control as Treasurer of Tennessee Coal, Iron & Railroad Company:

"(1) All ledgers, general and subsidiary, all journals, voucher books and cashbooks, and all subsidiary books and vouchers necessary to explain entries in such ledgers, journals, voucher books and cashbooks.

"(2) All trial balance and balance sheet books, or all trial balance and balance sheets, showing the assets and liabilities of the company at the end of the year 1918 and 1919, or at the end of each fiscal year ended in 1918 and 1919.

"(3) Stock ledgers and stubs of stock certificate book, and minute books containing reports and statements made to stockholders and directors, and copies of all such reports and statements made during years 1919 and 1920, if not recorded in minute book.

"(4) Copies of income and excess profits statements rendered the federal government in so far as such statements relate to invested capital and valuation of property for allowance of depreciation and depletion.

"(5) Copies of all inventories of merchandise and material at the close of the year 1919, or the fiscal year ended in 1919.

"(6) All insurance policies in force on October 1, 1919.

"(7) Copies of all statements of condition as reported to the commercial agencies, such as R. G. Dun, Bradstreet's Commercial Agency, etc., and all such statements as rendered to any bank or banker, or to any other person or firm as a basis for credit.

"(8) All books showing land values, including evidence of such values as engineers' reports, and other reports of like character, and also reports or statements made by the company on which capitalization was based or issues of bonds were made.

"(9) Any other books, papers or records to be found in the possession of the company which it might develop from examining the above-mentioned records would afford information touching the capital employed by the company in Alabama, or touching the valuation of any of the tangible property of the company."

The demurrers interposed were as follows:

"(1) It does not appear with sufficient certainty from the petition or the rule granted pursuant thereto, in connection with what proceeding or controversy before the plaintiffs it is sought to require them by mandamus to produce the books and documents of defendant company before plaintiffs or before this court or to permit officers or agents of plaintiff to have access to defendant company's books and documents, nor in connection with which it is sought to attach the individual defendants for failing to obey the mandate of the subpœna set forth in the petition.

"(2) It does not appear with sufficient certainty what books or documents it was sought to require these defendants to produce before the State Tax Commission in Montgomery.

"(3) It does not appear with sufficient certainty what books and records it is which plaintiffs ask the court to direct the production of, or to permit plaintiffs' officers or agents to have access to.

"(4) It does not appear with sufficient certainty what it is that it is sought by the petition to compel these defendants to do.

"(5) It does not sufficiently appear that the individual defendants are in any sort of default for declining to obey the mandate of the subpœna set forth in the petition.

"(6) It appears that the plaintiffs set aside the assessment of the defendant company's property, and it does not appear that there was any legal ground for so doing.

"(7) The plaintiffs have no right or power to compel the production by these defendants before this court of defendant company's books and records, or to compel these defendants to submit such books and records to an examination at the instance of plaintiffs in connection with a revaluation or reassessment of defendant company's property by them, in that the power attempted to be given the State Tax Commission to make such revaluation and reassessment by the Revenue Act of 1919 is unconstitutional, in that it is an attempt to confer on plaintiffs the right to deprive persons whose property is subject to taxation of that property without due process of law, contrary to the inhibitions of the Fourteenth Amendment to the federal Constitution.

"(8) No right to any relief against these defendants is shown.

"(9) It does not appear that there is any controversy between the plaintiffs and the defendant company with reference to the amount of the franchise tax of the defendant company, and in the absence of such controversy the production sought of the defendant company's books and documents under the power of the plaintiffs to fix such franchise tax would constitute an unreasonable search and seizure of defendant company's books and documents.

"(10) In so far as the production of defendant company's books and documents or access thereto is sought in connection with fixing defendant's franchise tax it does not appear the defendant company has made the return provided to be made by section 17 of the General Revenue Act of 1919.

"(11) In so far as the production of defendant company's books and documents or access thereto is sought in connection with fixing an assessment of defendant company's real property and tangible personal property for the year 1920, it appears that such assessment cannot now or in the future be made.

"(12) The proceeding is multifarious, in that it is sought to join a proceeding for mandamus with a proceeding to attach witnesses for failing to obey a subpœna.

"(13) The averments of the purpose for which access to defendant company's books and documents is sought are too vague and general to require an answer thereto.

"(14) The averments of the necessity of an examination of defendant company's books and documents by or at the instance of the plaintiff's are mere conclusions.

"(15) The proceeding is an attempt to procure an unreasonable search and seizure of defendant company's papers, in violation of section 5 of the Alabama Constitution.

"(16) It does not appear that defendant company is engaged in a business which is subject to tax on gross receipts or on capital employed in this state or on franchise or on intangible property or on income or on excess profits, and it does appear that the plaintiffs are seeking to inquire into or to require information as to its liabilities, earnings, profits and loss, and expenses of its conduct of business.

"(17) What it is that it is sought by mandamus to require the defendants jointly or separately to do is not pointed out with sufficient certainty."

Weatherly & Birch, of Birmingham, J. J. Mayfield, of Montgomery, Denson & Sons, of Opelika, and Smith, Wilkinson & Smith, of Birmingham, for appellants.

Legislature could create a state tax commission, with power of supervsion over the assessment of taxes. 179 Ala. 600, 60 South. 889; 196 Ala. 447, 71 South. 427; 14 Ala. App. 580, 70 South. 965; 182 Ala. 358, 62 South. 749; 185 Ala. 354, 64 South. 13, L. R. A. 1915D, 98; 123 N. Y. 76, 25 N. E. 329; 128 Wis. 326, 107 N. W. 635, 8 Ann. Cas. 595; 61 N. J. Law, 228, 39 Atl. 716. The fact that the prayer of the petition may request the production of books or papers as to which the petitioner is not entitled does not deny or defeat the right of the inspection or production of books to which the petitioner is entitled. 142 Ind. 1, 40 N. E. 654, 1087; 207 U. S. 541, 28 Sup. Ct. 178, 52 L. Ed. 327, 12 Ann. Cas. 658; 80 Vt. 55, 66 Atl. 790, 11 Ann. Cas. 1069; (C. C.) 128 Fed. 753; 14 Cyc. 368, 375, 377, 378. The Legislature may confer on the tax commission authority to make rules and regulations as it has done in section 139, Acts 1919, p. 318, and no constitutional provision is thereby invaded. 185 Ala. 354, 64 South. 13, L. R. A. 1915D, 98; 182 Ala. 357, 62 South. 749; 128 Wis. 326, 107 N. W. 635, 8 Ann. Cas. 595. The right sought to be asserted here is given in various subdivisions of section 138 and section 139 of the act, together with sections 21 and 14. Mandamus is the proper remedy. 86 Ala. 457, 5 South. 772; 89 Ala. 483, 7 South. 734; 123 Ala. 259, 26 South. 482, 45 L. R. A. 772; 7 Port. 446; 69 South. 419; 37 Cyc. 996; 26 Ib. 363. The constitutional provisions with reference to unreasonable searches and seizures apply to prevent investigation into private affairs only. 24 R. C. L. 721; 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652; 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; 207 U. S. 541, 28 Sup. Ct. 178, 52 L. Ed. 327, 12 Ann. Cas. 658. They apply only to criminal, and not to civil procedure, and the act itself prevents criminal prosecution against parties and witness. Section 149, p. 318, Acts 1919; 9 Ala. App. 191, 62 South. 397; 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110; 161 U. S. 659, 16 Sup.

Ct. 705, 40 L. Ed. 838; 194 U. S. 25, 24 Sup. Ct. 563, 48 L. Ed. 860; 101 U. S. 164, 25 L. Ed. 860; 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652. Section 9·of the subpœna duces tecum limits the production of such books and papers as would afford information desired is a clear limitation and not unreasonably broad. 207 U. S. 541, 28 Sup. Ct. 178, 52 L. Ed. 327, 12 Ann. Cas. 658; 146 Fed. 557; 167 Ind. 330, 79 N. E. 186, 7 L. R. A. (N. S.) 597, 119 Am. St. Rep. 503; 27 Mont. 441, 71 Pac. 602, 94 Am. St. Rep. 831; 258 Ill. 409, 101 N. E. 588. Section 2228, Code 1907, is still in force and effect, and, if not, the act itself secures the right of appeal from the decisions revaluing the property.

Percy, Benners & Burr, Cabaniss, Johnston, Cocke & Cabaniss, and Tillman, Bradley & Baldwin, all of Birmingham, for appellee.

A mandamus must be specific. 59 Ala. 321; 100 Ala. 607, 13 South. 779; 137 Ala. 639, 34 South. 684; 69 Ala. 261. The subpœna duces tecum was too general. 221 Pa. 529, 70 Atl. 867, 128 Am. St. Rep. 749, 15 Ann. Cas. 641; 2 Pen. & W. (Pa.) 139; 3 Wigmore on Evidence, § 2200; 82 Minn. 204, 84 N. W. 746; 72 Mo. 83, 37 Am. Rep. 426; 3 Dill. 566, Fed. Cas. No. 14,484; 60 Tex. Cr. R. 442, 132 S. W. 364, 31 L. R. A. (N. S.) 835; (C. C.) 128 Fed. 753. This is an unreasonable search and seizure. Sections 5 and 6, Const. 1901; Fourth Amendment, Const. U. S.; Wigmore, § 2257; 134 Ala. 639, 32 South. 1007; 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746; 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319; 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652; 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666. No proceeding is connected with the petition in which the company's books could be produced or inspected if the mandamus was granted. 211 U. S. 407, 29 Sup. Ct. 115, 53 L. Ed. 253; 236 U. S. 318, 35 Sup. Ct. 363, 59 L. Ed. 598. The state tax commission has no right to make a re-assessment, although it claims that right under subdivision "m," § 138, of the Revenue Act. 254 U. S. 64, 41 Sup. Ct. 27, 65 L. Ed. 134; 207 U. S. 127, 28 Sup. Ct. 47, 52 L. Ed. 134, 12 Ann. Cas. 463; 203 U. S. 323, 27 Sup. Ct. 87, 51 L. Ed. 204; 26 R. C. L. 345; 237 U. S. 424, 35 Sup. Ct. 625, 59 L. Ed. 1027. The Revenue Law of 1919 is an entire revision, and supersedes the provisions of section 2228, Code 1907.

GARDNER, J. This suit was commenced by the appellants, who compose the State Tax Commission, against the Tennessee Coal, Iron & Railroad Company, and its president, secretary, and auditor, as individuals, seeking to require the appellees by mandamus to submit the company's books and documents to appellants' inspection, or, in the alternative, to attach the individual appellees under the provisions of section 148 of the Revenue Act of 1919.

We leave a statement of the relevant facts set up in the petition to the reporter, and in. this opinion make merely a general reference thereto.

The respondent company is shown to be a corporation organized under the laws of Tennessee, duly authorized to do business in Alabama, and is so engaged in Jefferson county, owning large acreage of land therein and possessing valuable property. All of its books, accounts, and papers are in its offices in Birmingham, and the individual respondents above referred to have the custody and control thereof.

It further appears that in January, 1919, the company returned a list of the real and personal property to the tax adjusters of Jefferson county, and said board of tax adjusters placed a valuation thereon, which the petition describes as a "provisional valuation," but which was done without access to the books, records, and documents of the company. It averred in general terms that it is impracticable to properly assess the company's property without access to its books and documents; that after the board of tax adjusters had placed the valuation upon the property as above stated, petitioners requested the corporation to permit their expert accountants to inspect the company's books and documents in their behalf. This was denied, and on July 26, 1920, the petitioners, acting as the State Tax Commission, set aside the valuation made of the company's property by the board of adjusters. The Commission issued a subpœna duces tecum, directed to the company and the officers to produce before the commissioners on November 16, 1920, the books and documents as set forth in said subpœna. This subpœna will appear in the statement of the case.

A reference is made to section 148 of the Revenue Act, to the effect that witnesses failing or refusing to testify before the Commission would be subject to attachment and punishment for contempt by the circuit court.

Reference is also made to the effect that the respondent company is liable to franchise tax as well as tonnage tax, and that an inspection of its books and documents is needful and necessary for all these purposes.

There were numerous assignments of demurrer, among them that it did not appear with sufficient certainty from the petition in connection with what proceedings or controversy before the ·petitioners it is sought to require them to produce the books and documents of the company, or to permit the officers or agents of the Commission to have access to the company's books and documents, or in connection with what proceedings it is

sought to attach the individual respondents for failing to obey the mandate set forth in the petition; and, further, that it does not appear with sufficient certainty what books and documents it was sought to require the respondents to produce. There are other assignments of demurrer to the effect that no necessity is shown for such examination, and the proceeding is an attempt to procure an unreasonable search and seizure of respondent's papers in violation of the Constitution. The demurrer to the petition was sustained, and the rule nisi quashed. Petitioners declined to further amend the petition, and the same was dismissed, and this appeal is prosecuted to review the rulings of the court below thereon.

There are presented upon this appeal some questions which are referred to as "subsidiary," but which, in our opinion, need no separate treatment, as we base the conclusion reached upon questions which are fundamental and reach the merits of the cause.

It is noted that the averments of the petition, in connection with what proceeding or controversy before the petitioners the books and documents referred to are sought to be produced, is stated in a vague and indefinite manner. Indeed, counsel for appellants, as we understand the argument, both orally upon submission and in brief, insist that no proceeding or controversy of any character is required for the exercise of the power to have produced the books and documents of the respondent corporation; but that under the provisions of section 138 of the Revenue Act of 1919 (Gen. Acts 1919, p. 318 et seq.), the State Tax Commission, in the exercise of its general and complete supervision over the valuation, equalization, assessment, and collection of taxes, and the enforcement of the same in this state, has the power and authority to demand of the taxpayer at any time, and regardless of any pending matter or controversy, the inspection of his private books and papers which may bear any relation to property valuation or the subject of taxation. Counsel for appellee, on the other hand, insist that such inquisitorial power would be violative of section 5 of the Constitution of this state, as well as the Fourth Amendment to the federal Constitution. We consider this the question of prime importance upon this appeal, and will therefore proceed to its consideration. Section 5 of the Alabama Constitution reads:

"That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizures or searches and that no warrant shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation."

The Fourth Amendment to the federal Constitution is as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against un-reasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

We discover no substantial difference between these constitutional provisions, and therefore those cases which construe the Fourth Amendment to the federal Constitution are in point as to the Alabama provision.

The leading authority upon this question of what is an unlawful search and seizure within the meaning of such constitutional provision is Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746. That case involved a proceeding the result of which would be a forfeiture of defendant's property for an alleged fraud against the revenue laws of the United States. In a consideration of that case it is to be noted at the outset that a compulsory production of a man's private papers is held to be the equivalent of a search and seizure thereof within the meaning of the Constitution. Mr. Justice Bradley, the author of the opinion in the Boyd Case, reviews the history of the law against unlawful search and seizure, and from this opinion there have been frequent quotations by that court. Its history in England, as pointed out therein, arose from the practice of the issuance of general warrants by the Secretary of State for searching private houses for the discovery and seizure of books and papers that might be used to convict the owner of a charge of libel, out of which arose the notable case of Entick v. Carrington and Three Other King's Messengers, reported in 19 Howell's State Trials, 1029. This was an action of trespass for entering the plaintiff's dwelling house and breaking open his desk and searching and examining his papers. Lord Camden pronounced the judgment of the court, and, as stated in the opinion:

"It is regarded as one of the permanent monuments of the British Constitution."

In the Entick Case, the power exercised by the Secretary of State for the issuance of general search warrants, and the manner of their execution, oppressive to the citizens, was pointed out with the concluding words by Lord Camden, as follows:

"Such is the power, and therefore one would naturally expect that the law to warrant it should be clear in proportion as the power is exorbitant. If it is law, it will be found in our books; if it is not to be found there, it is not law. The great end for which men entered into society was to secure their property. That right is preserved sacred * * * in all instances where it has not been taken away or abridged by some public law for the good of the whole. The cases where this right of property is set aside by positive law are various. Dis-

tresses, executions, forfeitures, taxes, etc., are all of this description, wherein every man by common consent gives up that right for the sake of justice and the general good."

Continuing, the opinion shows that the owners of goods and chattels are to be protected from an unlawful seizure, and the general warrants issued by the Secretary of State were, under such circumstances there outlined, declared illegal and void. As pointed out in the Boyd Case, every American statesman during our Revolution and formative period as a nation was familiar with this monument of English freedom, and that it was doubtless in the minds of those who framed the Fourth Amendment to the Constitution, who considered it a sufficient explanation of what was meant by unreasonable search and seizure. Commenting further upon Lord Camden's opinion, Justice Bradley said:

"The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offense—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other."

Referring more particularly to the history of the Fourth Amendment to the federal Constitution, the opinion in the Boyd Case directs attention to the fact that the practice had obtained in the colonies of issuing writs of assistance to revenue officers for the purpose of searching suspicious places for smuggled goods; and that this should be considered in connection with the judgment of the court in the Entick Case for the ascertainment of the true history of the Fourth Amendment. Speaking to this question, the court said:

"In order to ascertain the nature of the proceedings intended by the Fourth Amendment to the Constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' since they placed 'the liberty of every man in the hands of every petty officer.' This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the Colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.' "These things, and the events which took place in England immediately following the argument about writs of assistance in Boston, were fresh in the memories of those who achieved our independence and established our form of government."

This view is in full accord with the treatment of the subject by Judge Cooley (Cooley's Const. Limitations [5th Ed.] 365), where the learned author says:

"Near in importance to exemption from any arbitrary control of the person is that maxim of the common law which secures to the citizen immunity in his home against the prying eyes of the government, and protection in person, property, and papers against even the process of the law, except in a few specified cases. The maxim that 'every man's house is his castle.' is made a part of our constitutional law in the clause prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen.

"If in English history we inquire into the original occasion for these constitutional provisions, we shall probably find it in the abuse or executive authority, and in the unwarrantable intrusion of executive agents into the houses and among the private papers of individuals, in order to obtain evidence of political offenses either committed or designed.

"The history of this controversy should be read in connection with that in America immediately previous to the American Revolution, in regard to writs of assistance issued by the courts to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods. * * * All these matters are now a long way in the past; but it has not been deemed unwise to repeat in the state Constitutions, as well as in the Constitution of the United States. the principles already settled in the common law upon this vital point in civil liberty."

The Supreme Court in Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, after citing the Boyd Case, approved what was there said with the following comment:

"As was there shown, it took its origin in the determination of the framers of the amendments to the federal Constitution to provide for

that instrument a Bill of Rights, securing to the American people, among other things, these safeguards which had grown up in England to protect the people from unreasonable searches and seizures, such as were permitted under the general warrants issued under authority of the government by which there had been invasions of the home and privacy of the citizens and the seizure of private papers in support of charges, real or imaginary, made against them. Such practices had also received sanction under warrants and seizures under the so-called writs of assistance, issued in the American colonies. See 2 Watson on the Constitution, 1414 et seq. Resistance to these practices had established the principle which was enacted into the fundamental law in the Fourth Amendment, that a man's house was his castle and not to be invaded by any general authority to search and seize his goods and papers. Judge Cooley, in his Constitutional Limitations, pp. 425, 426, in treating of this feature of our Constitution, said: "The maxim that "every man's house is his castle" is made part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen.'"

Further on in the opinion in the Weeks Case it was pointed out that the Fourth Amendment placed the courts of the United States and certain officials in the exercise of their authority, under limitations and restraints, as to its exercise, and that the effect of said amendment was "to forever secure the people their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all intrusted under federal system with the enforcement of the laws."

Commenting on the Fourth and Fifth Amendments to the federal Constitution, the court in the very recent case of Gouled v. United States, 255 U. S. 298, 41 Sup. Ct. 261, 65 L. Ed. 647, said:

"It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, in Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, and in Silverthorne Lumber Co. v. United States, 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319, have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two amendments. The effect of the decisions cited is that such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen—the right to trial by jury, to the writ of habeas corpus, and to due process of law. It has been repeatedly decided that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly over-zealous, executive officers."

Many authorities are reviewed by the Texas Court of Criminal Appeals in Ex parte Gould, 60 Tex. Cr. R. 442, 132 S. W. 364, 31 L. R. A. (N. S.) 885, where is found the following language, here applicable:

"The protection of papers is as much secured under the provisions of the Bill of Rights as a man's house, and the same rules that apply to one apply to the other."

Should any doubt ever have been entertained as to whether or not a corporation was entitled to the protection of the Fourth Amendment against unreasonable search and seizure, such doubt was entirely removed by what was said in the case of Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652, as follows:

"Although, for the reasons above stated, we are of the opinion that an officer of a corporation which is charged with a violation of a statute of the state of its creation, or of an act of Congress passed in the exercise of its constitutional powers, cannot refuse to produce the books and papers of such corporation, we do not wish to be understood as holding that a corporation is not entitled to immunity, under the Fourth Amendment, against unreasonable searches and seizures. A corporation is, after all, but an association of individuals under an assumed name and with a distinct legal entity. In organizing itself as a collective body it waives no constitutional immunities appropriate to such body. Its property cannot be taken without compensation. It can only be proceeded against by due process of law, and is protected, under the Fourteenth Amendment, against unlawful discrimination. Gulf, etc., R. R. Co. v. Ellis, 165 U. S. 150, 154, and cases cited. Corporations are a necessary feature of modern business activity, and their aggregated capital has become the source of nearly all great enterprises.

"We are also of opinion that an order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment. While a search ordinarily implies a quest by an officer of the law, and a seizure contemplates a forcible dispossession of the owner, still, as was held in the Boyd Case, the substance of the offense is the compulsory production of private papers, whether under a search warrant of a subpœna duces tecum, against which a person, be he individual or corporation, is entitled to protection. Applying the test of reasonableness to the present case, we think the subpœna duces tecum is far too sweeping in its terms to be regarded as reasonable."

To the same effect is the very latest utterance of the court in the case of Silverthorne Lumber Co. v. United States, 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319, where it was said:

"But the rights of a corporation against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way."

That the Boyd Case has not only never been departed from, but has been frequently cited with approval as to what was said upon the Fourth and Fifth Amendments of the federal Constitution, was pointed out in the majority opinion of the court in Ex parte Rhodes, 202 Ala. 68, 79 South. 462, 1 A. L. R. 568, wherein the court said:

"Counsel also seems to think that the Supreme Court of the United States has departed from the doctrine announced in the case of Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed.. 746. That court has never departed from the construction of the Fourth and Fifth Amendments to the federal Constitution placed thereon by Judge Bradley in Boyd's Case. It was not departed from in the case of Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652. It was only distinguished by Judge Brown from the case then in hand. It was as to the point here in question fully affirmed, and was in part quoted with approval. It has often been quoted with approval, as to its construction of both the Fourth and the Fifth Amendments, and has never been departed from. See Rose's Notes to that decision. As late as the case of Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, Boyd's Case is accepted and quoted as to the constructions of these Bills of Rights."

The language of the Boyd Case met the approval of this court at a very early period, after the deliverance of the. opinion, as disclosed in the case of Chastang v. State, 83 Ala. 29, 3 South. 304, wherein Chief Justice Stone, after stating that the court had read the able opinion of Justice Bradley in Boyd v. United States, said: "We indorse and approve everything said therein."

There appears to be some insistence on the part of counsel for appellant that such constitutional provision only "applies to criminal procedure," but the authorities cited to this end do not sustain that view. Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, and Councilmen v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110, cited in counsel's brief involve only the Fifth Amendment to the federal Constitution, and are therefore without application. In the case of Flint v. Stone-Tracy Co., 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312, it was merely held that the requirement that the returns of the corporation as to assessments there in question should be open to inspection upon the order of the president, and upon the rules and regulations to be prescribed by the secretary and treasurer, and approved by the president, was not violative of the constitutional protection of the Fourth Amendment, and it was pointed out in the opinion that in many of the states laws of similar character are found regulating tax returns. It requires no discussion to disclose that that authority does not sustain the contention. The language which we have previously quoted from Weeks v. United States, to the effect that this protection reaches all alike, whether accused of crime or not, should be conclusive of this question. Indeed, the language as to unreasonable search and seizure in our state Constitution, as well as the Fourth Amendment to the federal Constitution, contains no exception as to civil procedure, or any other exception; and to hold that such constitutional protection was merely applicable to criminal procedure would be entirely unwarranted. In the very recent case of Gouled v. United States, 255 U. S. 298, 41 Sup. Ct. 261, 65 L. Ed. 647, the court said:

"The prohibition of the Fourth Amendment is against all unreasonable searches and seizures."

Nor do we find anything in the case of Ex parte Pepper, 185 Ala. 284, 64 South. 112. that militates against the conclusion here reached. Neither section 5 of our Constitution nor the Fourth Amendment to the federal Constitution was there discussed or considered. Nor do the cases of Ex parte Davies, 168 N. Y. 89, 61 N. E. 118; 56 L. R. A. 855, Co-operative B. & L. Ass'n v. State, 156 Ind. 463, 60 N. E. 146, and Satterwhite v. State, 142 Ind. 1, 40 N. E. 654, 1087, cited by counsel for appellant, conflict with this view.

This leads us therefore to a consideration of the asserted power of the State Tax Commission in view of these constitutional provisions. To place the question in more concrete form: Would the power and authority of the State Tax Commission to demand of the taxpayer an inspection of his private books, documents, and papers, of every character in connection with his business, at any time, without regard to any pending matter or controversy, be violative of the constitutional provision, above discussed, against unreasonable search and seizure? The power here sought to be exercised is in the nature of a bill of discovery, but is more sweeping and far-reaching; for a bill of discovery would be condemned which disclosed upon its face that it was a mere "fishing expedition." While one may maintain a bill of discovery for the ascertainment of relevant facts and circumstances in the possession of the adverse party, yet, as said in 9 R. C. L. p. 171:

"The right, however, can be justified only on the ground that there is a real cause of action pending or to be brought, and that the court is entitled to the information in aid of proper judicial proceedings, and the discovery, either from a party or by the production of books and papers, must be of matter which is material and pertinent to the issues in the case. * * * A court will not interfere in this way to enable a party to search out evidence or witnesses, or,

as it is sometimes expressed, the remedy by discovery or interrogatories will not be permitted or the production of books and papers ordered for fishing purposes."

And in American Car & Foundry Co. v. Water Co., 221 Pa. 529, 70 Atl. 867, 128 Am. St. Rep. 749, 15 Ann. Cas. 641, is the following quotation from 23 Am. & Eng. Ency. of Law (2d Ed.) 179:

"The courts uniformly decline to grant an application for production and inspection where it is merely for the purpose of a fishing examination, as where it is made to discover whether or not there is evidence contained in the documents which will be useful to the applicant, or for the purpose of determining whether he has a cause of action, or a defense, or in anticipation of a defense, or to gratify curiosity."

A similar sweeping authority was claimed by the Interstate Commerce Commission in the case of I. C. C. v. Harriman, 211 U. S. 407, 29 Sup. Ct. 115, 53 L. Ed. 253, where it was insisted that the purpose of the act establishing the Commission, embrace all the duties that the act imposes and the powers that it gives, one of which was that the Commission should keep itself informed as to the manner and method in which the business of the carriers is conducted, and another that it should recommend additional legislation, and for either of these general objects it may call on the courts to require any one whom it may point out to attend and testify if he would avoid the penalties for contempt. Speaking to this insistence, the court said:

"We are of opinion, on the contrary, that the purposes of the act for which the Commission may exact evidence embrace only complaints for violation of the act, and investigations by the Commission upon matters that might have been made the object of complaint. As we already have implied, the main purpose of the act was to regulate the interstate business of carriers, and the secondary purpose, that for which the Commission was established, was to enforce the regulations enacted. These, in our opinion, are the purposes referred to; in other words, the power to require testimony is limited, as it usually is in English-speaking countries at least, to the only cases where the sacrifice of privacy is necessary—those where the investigations concern a specific breach of the law. * * *

"If we did not think, as we do, that the act clearly showed that the power to compel the attendance of witnesses was to be exercised only in connection with the quasi judicial duties of the Commission, we still should be unable to suppose that such an unprecedented grant was to be drawn from the counsels of perfection that have been quoted from sections 12 and 21. We could not believe on the strength of other than explicit and unmistakable words that such autocratic power was given for any less specific object of inquiry than a breach of existing law, in which, and in which alone, as we have said, there is any need that personal matters should be revealed."

We think a reading of the opinion discloses the court was of the view that to have construed the act otherwise, and as giving this broad sweep of authority, would have necessitated holding that it was violative of the Constitution; for the opinion concludes:

"If we felt more hesitation than we do, we still should feel bound to construe the statute, not merely so as to sustain its constitutionality, but so as to avoid a succession of constitutional doubts, so far as candor permits."

It thus appears that the authority claimed for the State Tax Commission in the demand of the inspection of the private books and documents and papers, in the absence of any pending matter or controversy, is far greater than any power assumed or exercised heretofore by the courts. Indeed, we are not aware that so unlimited a command over the private affairs of citizens has heretofore been given to any Commission or to any court.

The authorities emphasize the fact that privacy as to one's papers and documents is as much under the protection of the Constitution as his home, the same rule applying to the one as applies to the other. This right of privacy must yield when the administration of justice and the public good demand, and we fully realize that the matter of assessment and taxation of property for the purpose of government revenue is an instance when this right of privacy is held to yield for the public good, and much is left to legislative discretion. Nevertheless, even as to these matters, the Constitution has made no exceptions, and a search and seizure of one's private papers, even for such purpose, may be "unreasonable" within the meaning of these constitutional provisions. As pointed out in the foregoing authorities, the practice of the issuance of warrants in aid of the revenue officers in early history of this country should be considered as playing a part in the history of the Fourth Amendment to the federal Constitution.

To hold that the constitutional prohibition against unreasonable search and seizure does not apply to the revenue laws would be for the court to write into the Constitution an exception entirely unwarranted by any language there found. These constitutional provisions serve equally as restrictions upon the courts as upon every ministerial officer, demanding the same obedience from the one as the other. It is only left for the courts to determine what is "unreasonable," within their meaning. When that is done, the judicial function ceases.

An analysis of the power here asserted in the instant case shows that its exercise would subject the taxpayer to a disclosure of his private affairs to the Tax Commission at any time demanded, although he has met all requirements of the law and there exists no controversy, and this for the purpose of a mere fishing expedition, a power not even

possessed or attempted to be exercised by the courts of the land. True, the power may not be employed by those in authority to the vexation or annoyance of the citizens, but we are now considering the extent of the power, and not its mere exercise by those who so happen at the time to possess it. When viewed in this light, it must be conceded that such a power would be of a more or less autocratic nature, and out of harmony with the form of government here enjoyed. Not only so, but such authority would lead away from that stability as to taxation referred to as so desirable in State v. Doster-Northington Drug Co., 196 Ala. 447, 71 South. 427, for at no period during the tax year could the taxpayer feel secure as to a settlement of the question of his taxation.

In State v. Doster-Northington Drug Co., supra, this court had under review the power of the State Tax Commission to set aside an assessment of a taxpayer and to revalue and reassess the property, and it was held that such a review must be sought within the period of the tax year, and that matured assessments were binding alike on the taxpayer and taxing authorities, the court saying:

"The reasonable construction of the power of assessment of taxes, and the review thereof, should be to the end that a stable and uniform system prevail in the state"

—and, again, in the same authority, the following:

"The two provisions of the statute (Code, §§ 2223, 2260), when considered with the whole system of taxation provided for the state, and with due regard for the property rights of the citizen, as well as for the right of the state to equalize the burdens of taxes and to provide its revenues, can only mean that the right of general and complete supervision given in section 2223 to the State Tax Commission must be reasonably exercised.

"If section 2223 can be construed to confer authority on the State Tax Commission, at any time after the expiration of the tax year, to set aside and hold for naught any valuation of assessment of property made by the owner or any of the officers authorized by law to make assessments, it might become the source of great vexation, and of even oppression, to the taxpayer, and render uncertain property rights, and subject the taxpayer and his property to unreasonable and uncertain claims and tax liens."

This construction was placed upon the act, notwithstanding in its language it had no such specific limitations, but such construction was entirely justified for the reason that such legislation should be construed to the end that a stable and uniform system prevail, and not so as to become a source of great vexation and unnecessary expense to the taxpayer.

It is recognized that the language of section 138 of the Revenue Act of 1919 is broad in its grant of authority to require information as to the property of the taxpayer, and the production of records, papers, and documents; but, considering the language of the entire act in connection with the foregoing quotation from the above authority, we are of the opinion that it should be construed as relating only to some pending matter or controversy, as authorized therein. To construe it otherwise, and as granting to the Commission authority to demand of the taxpayer a production of his papers, books, and documents, at any time, and without regard to any such pending matter or controversy. would be to read the statute as violative of the constitutional provisions here discussed, as an unreasonable invasion of the privacy of the citizens. The language used should be so construed as to uphold the constitutionality of that portion of the act if consistent with the legislative intent therein disclosed. We therefore construe this language, with the limitation above expressed.

The next question arises as to whether or not, therefore, a pending cause or controversy is shown. So far as the averments as to franchise tax are shown, it does not appear that the written statement under oath, prescribed by section 17 of the act, has been filed; and the averments of this petition cannot be construed as an attempt on the part of the State Tax Commission to exercise the authority given by section 21 in relation to such tax, nor does the petition question in the least that the respondent corporation is promptly and correctly paying the tonnage tax fixed by the Revenue Act, and therefore discloses no controversy in regard thereto. Therefore, as to these two questions, they may be laid out of view.

We reach the principal insistence as to this particular question, and that is that at the time of the filing of this petition the Commission had set aside the assessment or valuation of the property as fixed by the board of tax adjusters of Jefferson county, and that the information here sought is needful for the purpose of revaluation of this property by the State Tax Commission, and that therefore this is a pending cause which meets all the requirements of the argument of counsel for appellee. This is conceded if the Commission had such authority. The next question therefore is, Was the Commission so authorized? Under subdivision "m" of section 138 the power to set aside assessments or to reassess or revalue the property is given to this Commission, but to this end the statute requires no notice of any character to issue to the taxpayer.

Another constitutional question is therefore presented, and that is: Has the Commission the power to set aside the assessment and reassess and revalue the property of the taxpayer in the absence of a requirement of notice of some character to the taxpayer fixed by the statute itself? This question must be answered in the negative. No hearing

before the State Tax Commission is provided, and no notice to the taxpayer of such action, but merely that an appeal may be taken by the taxpayer from such revaluation to the court of county commissioners; but it is quite apparent that a provision for an appeal would be entirely useless, unless the taxpayer was given notice as to such reassessment and revaluation, for the exercise of an appeal in such cases would be but a mere accident. He could not be expected to appeal from that of which he had no notice. Therefore, the right to appeal, in the absence of notice of some character, is a meaningless thing under this statute. That notice is required to be given the taxpayer as a matter of right has been many times decided by the Supreme Court of the United States in construing the due process clause of the federal Constitution. In the recent case of Turner v. Wade, 254 U. S. 64, 41 Sup. Ct. 27, 65 L. Ed. 134, the court said:

"Therefore, looking to the sections of the statute for ourselves, we are forced to the conclusion that, reading the provisions together, being parts of one and the same act, they clearly show that the board of assessors was not required to give any notice to the taxpayer, nor was opportunity given him to be heard as of right before the assessment was finally made against him."

"In considering certain sections of the Georgia Tax Laws this court held, in Central of Georgia v. Wright, 207 U. S. 127, 28 Sup. Ct. 47, 52 L. Ed. 134, 12 Ann. Cas. 463, that due process of law requires that after such notice as may be appropriate the taxpayer have opportunity to be heard as to the validity of a tax and the amount thereof, by giving him the right to appear for that purpose at some stage of the proceedings. * * *

"If the Legislature of the state, instead of fixing the tax itself, commits to the subordinate body the duty of determining whether, and in what amount, and upon whom the tax shall be levied, due process of law requires that at some stage of the proceedings, before the tax becomes irrevocably fixed, the taxpayer must have the opportunity to be heard, of which he must have notice, whether personal, by publication, or by some statute fixing the time and place of the hearing."

The authorities emphasize the fact also that this notice must be as a matter of right, and not of favor or "grace." Many of the authorities are cited in the case of Coe v. Armour Fert. Co., 237 U. S. 424, 35 Sup. Ct. 625, 59 L. Ed. 1071. See, also, Security Trust, etc., Co. v. City of Lexington, 201 U. S. 323, 27 Sup. Ct. 87, 51 L. Ed. 204; 26 R. C. L. 345.

Indeed, the requirement of notice was recognized by this court in State Tax Comm. v. Bailey & Howard, 179 Ala. 620, 60 South. 913, where it was said:

"No doubt the constitutional requirement of 'due process of law' applies to tax proceedings, and it is necessary that the taxpayer shall have opportunity to be heard in opposition of the assessment or valuation before his liability is conclusively fixed. * * * Yet section 2228 fully meets this requirement by providing 30 days' notice to the owner before the reassessment or revaluation by the State Tax Commission."

Section 163 of the Act of 1919 only has reference to the assessment on the tangible property of public utilities by the State Tax Commission, and is entirely without application to the section of the act now under consideration.

It is also suggested by appellants' counsel that when the taxpayer files his list of property with the county assessor, "he is in court," as it were, and that the entire proceeding is a unit, and that no notice therefore is required. There are numerous provisions for notice and hearing before the county adjusters, both in sections 88 and 89, and these would be entirely useless if the Legislature was of the opinion that the filing of the list of property by the taxpayer was sufficient to meet all requirements of the Constitution. Clearly, it could not reasonably be contended that because the taxpayer has filed his list with the county assessor he must continue to be on the lookout for reassessments to be made by the State Tax Commission in its office at the State Capitol.

There is likewise a suggestion that the Commission is given the authority to prescribe certain rules and regulations, and that for aught that appears such rules have been adopted prescribing notice to the taxpayer in cases of this character. The quotations from the authorities supra demonstrate that this is insufficient. The notice to the taxpayer must be a matter of right, and not of grace or favor or mere discretion.

But it is insisted by counsel for appellant that section 2228 of the Code, noted in the Bailey & Howard Case, is still of force, and therefore there exists a statute requiring notice to the taxpayer; but the act of 1919 is not amendatory of any revenue law. It is original and complete within itself. We find no provision therein which would revive the requirements of that section. The act of 1919 states that there is hereby created a commission to be known as the State Tax Commission, which had by previous act been abolished, and what was termed the Equalization Board established in its stead; and it is manifest that the section of the Code of 1907, above referred to, cannot be carried forward and so construed as to refer to a state tax commission created in 1919. The Revenue Act of 1911 (Acts 1911, p. 159) was merely amendatory of the existing revenue laws, as disclosed upon its face, and the reference to section 2228, Code of 1907, in the Bailey & Howard Case, supra, was therefore justified, and that authority does not militate in the least against the conclusion here reached.

The Revenue Act of 1915 (Acts 1915, p.

386) contained a provision expressly preserving in force all provisions of existing laws relating to taxation and revenues, not in conflict, and this provision was relied upon by the court in holding section 36 of the Act of 1911 still of force in the case of Ex parte Smith, 203 Ala. 444, 83 South. 334. No such provision is found in the present Revenue Act. Many new features as to taxation are there introduced, and the act by its title and context clearly discloses an intention on the part of the Legislature to cover the whole subject. The very omission of the saving provision above referred to is significant. By the Revenue Act of 1915, the State Tax Commission was abolished, and there was created a state board of equalization. So also section 2228 of the Code refers to property valued by the county tax commissioner, which office has likewise been abolished. .

By the present act a state tax commission is established, and it too closely resembles judicial legislation to hold that section 2228 of the Code could have reference, under these circumstances, to a commission and to officers created in 1919. The present act is replete with provisions for notice to be given the taxpayer in all other respects except as to this particular power of the Tax Commission, and as to that authorizes an appeal, but omits any provision as to notice. Whether this was intentional or as a matter overlooked we need not inquire. It is not provided, and nothing either indicating an intention to do so, or any reference thereto whatever. The courts may not legislate by construction, and it is manifest the Legislature did not have in mind the foregoing section of the Code as having any relevancy or bearing here. It is not at all a question of repeal by implication, but simply one of inapplicability of the Code provision to the Revenue Act of 1919. Such provision had reference to a commission and officers then created, but subsequently abolished. It served its purpose, and we are unable to agree that it may now be resurrected, and brought forward to amend a vital defect in the present act.

We are persuaded that none of these suggestions suffice to meet the requirements of the due process clause, as construed by the Supreme Court of the United States, above referred to, and we are constrained to hold therefore that the State Tax Commission is without authority to set aside the assessment here in question, and reassess and revalue the property. There is therefore no pending cause or controversy, and in the absence of such the Commission was without authority to demand an inspection of the books, documents, and papers of the corporation; and the demurrer thereto was properly sustained.

The foregoing represents the views of the writer (to whom the cause was originally assigned for the preparation of an opinion), and Justice SAYRE who concurs therein, but upon consultation this opinion did not meet with the approval of the other members of the court, who entertain the view that section 2228 of the Code of 1907 may still be considered as of force and applicable to the present Revenue Act. The writer and Justice SAYRE, for the reasons set forth herein, are of a contrary opinion, and have reached the conclusion that the judgment of the trial court should be accordingly affirmed. The majority, however, are of the opinion the judgment should be reversed, and from this holding the writer and Justice SAYRE respectfully dissent. The views of the majority are stated by the Chief Justice as follows:

ANDERSON, C. J. (for the majority). As we understand, the contention of appellees and the theory upon which the opinion of Justice GARDNER proceeds is that, in order for the appellants to inspect the books, etc., of the appellees, it must be for the purpose of obtaining material and relevant evidence in a pending legal controversy; that if the State Tax Commission had the authority to vacate the appellees' assessment and revalue and reassess its property, this would be a pending controversy, and it would not violate the Constitution, federal or state, by inspecting or requiring the appellees' books, etc., for the purpose of ascertaining the extent and value of its taxable property in an effort to properly reassess the same; that this is not a pending legal controversy, however, for the reason that the State Tax Commission had no authority to set aside the assessment and to revalue and reassess the same; that while paragraph "m" of section 138 of the Revenue Act of 1919 gives them this right, said paragraph nor any other provision of the act provides for notice to the taxpayer, and that said paragraph "m" is therefore unconstitutional and void.

[1] The majority, for the purpose only of deciding this case, is willing to concede the hypothesis as presented by the theory of Justice GARDNER'S opinion, except as to the statement that paragraph "m" of section 138 is void. As to this, we cannot concur. We think, and so hold, that paragraph "m" of section 138 is not repugnant to the Constitution, federal or state, because of a failure of the act to prescribe notice to the taxpayer of the purpose to revalue or reassess his property. Section 2228 of the Code of 1907 provides for such notice, and we have held that the notice as there prescribed met all constitutional requirements, and was sufficient if given before the reassessment of the property by the State Tax Commission, and was only important in case the value was increased. State Tax Commission v. Bailey, 179 Ala. 620, 60 South. 913; State v. Doster-Northington Co., 196 Ala. 450, 71 South. 427. While the Revenue Act of 1919 purports to

be a complete revision of the tax laws and to cover the entire subject, and would ordinarily operate, without a repealing clause, to repeal by implication all prior laws in conflict therewith, we think that the repealing clause of said act and its predecessors indicate a legislative intent to repeal only so much of the Code of 1907 as is in conflict therewith, and does not repeal such Code provisions not in conflict, and which may be essential to an efficient enforcement and administration of the revenue law, certainly not such parts of the Code as may be essential to give constitutional validity to the subsequent enactments. Bailey & Howard, supra; Ex parte Smith, supra. It would be a reflection upon legislative intelligence to hold that by the present revenue law they repealed section 2228 of the Code without making provision for notice, after this court had held in the Bailey v. Howard Case, supra, that notice was essential, and cited and construed said section 2228 in connection with the reassessment of property by the State Tax Commission.

[2] True, the repealing clause of the act of 1919 is not identical with the one in the act of 1915, and which was considered in the Smith Case, supra. But as used in the present law it expresses a legislative intent and purpose to repeal only so much of previous enactments as are in conflict therewith, and thereby indicates that it was not therefore intended as complete and exclusive, in and of itself.

"The rule that a later act, covering the whole subject of a prior one and embracing new provisions, plainly showing that it was intended as a substitute, operates by implication to repeal the prior act, is subject to the qualification that where the later act expresses the extent to which it is intended to repeal prior laws, as by a clause repealing all laws and parts of laws in conflict therewith, it excludes any implication of a more extended repeal." Great Northern R. R. v. United States, 155 Fed. 945, 84 C., C. A. 93.

This holding is not only proper, but in effect requires notice to the taxpayer before his property is revalued and reassessed by the State Tax Commission under paragraph "m" of section 138, and removes the constitutional objection to said paragraph as suggested in the opinion of Justice GARDNER. The Legislature evidently did not intend to cut off notice after this court had held it was essential, and must have intended that section 2228 was not repealed. Just as section 2229 fixes the time within which an appeal can be taken, paragraph "m" of section 138, for instance, provides for an appeal to the county commissioners or board of revenue, thus changing section 2229 of the Code as to the forum in which the appeal is to be heard, but it could not be logically held that the time limit was changed when the last enactment fixes no time.

[3] We concede that certain portions of the demands are too broad and indefinite, and that they are erroneous in so far as they seek a production of the books, etc., to the State Tax Commission at the Capitol, as we think that the law contemplates that the revaluation and reassessment under paragraph "m" of section 138 and the hearing in connection therewith should be in the county in which the property to be reassessed is situated. This is manifest from the notice required by section 2228 of the Code of 1907. And in addition to this, it is apparent that the last enactment throughout contemplates that these tax controversies should be heard in the county where the property is situated. When the assessments are set aside by the State Commission as per the county, municipal, or precinct basis, it is to be reassessed by the local tax machinery, and while the State Commission is given the right to reassess after setting aside the individual assessments as covered by section 138 of the act, the law contemplates that the hearing should be by said State Commission in the county where the property is situated. Section 2228 not only contemplates this, but the present act authorizes and requires said Commission to visit the respective counties, and provides for its expenses being paid by the state. In other words, while the act, by sections 21, 148, and 417 are intended to afford the tax authorities all reasonable and necessary information and data in the assessment, adjustment, and equalization of taxes throughout the state, it was not intended that the taxpayers from all parts of the state should be compelled to transport their books, records, etc., to the Capitol at Montgomery, but should do so at the courthouses of the county in which the property is situated.

[4, 5] As above stated, some of the demands were too general, and the requirement that the books, etc., be brought to Montgomery was not authorized, yet the answer to the duces tecum, while questioning the right and authority as to time and place of delivery, also questions the general right or authority to demand the production, and therefore justified resort by the State Tax Commission to the courts to compel submission and obedience. While we think that the petition contained items and demands defective for reasons above set forth, it sought alternative relief, and the appellees' demurrer thereto was not directed against so much of the petition or the things sought as were improper, but were directed against the same in its entirety. In other words, there was no ground of demurrer raising the point against so much of the petition as sought the production of the books at Montgomery instead of Birmingham, or against such parts of same as were too general and indefinite, and as some of the demands were sufficient the trial court erred in sustaining the demurrer to the pe-

tition in its entirety. Moreover, the fact that the duces tecum was broader than it should have been did not relieve the parties from responding or from a contempt for failing to do so. Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652; Consolidated Co. v. Vermont, 207 U. S. 541, 28 Sup. Ct. 178, 52 L. Ed. 327, 12 Ann. Cas. 658.

The judgment of the circuit court sustaining the demurrer to the petition and dismissing said petition is reversed, a judgment is here rendered, overruling said demurrer and setting aside the dismissal of the petition, and the cause is remanded, in order that the parties may proceed in conformity with this opinion.

Reversed, rendered, and remanded.

McCLELLAN, SOMERVILLE, THOMAS, and MILLER, JJ., concur.

SAYRE and GARDNER, JJ., dissent.

McCLELLAN, J. That the state, through the adequate authorization of its state tax officers or its Commission, may compel all taxpayers, whether individuals, associations of individuals, or corporations, to make such full disclosures of particular or property possessions and business conduct as will enable the taxing authorities to ascertain taxable values, to effect uniformity of assessment, and to impose the burdens of taxation with justice and equality between those of the same class, cannot be a matter of doubt. Against the lawfully authorized effectuation of these public purposes, so essential to the existence of the government as well to justice to taxpayers of like class, thdre can be no right to individual privacy, secrecy, or immunity. These public purposes must, of course, be reasonable, not unreasonably burdensome or calculated to introduce unfair or invidious interference with the business or pursuit of taxpayers.

The writer concurs in the view, stated with supporting considerations in the majority opinion, that Code, § 2228, has not been repealed by implication. However, if that statute (Code, § 2228) had been repealed by implication, the writer entertains the opinion that neither the revenue law nor any provision of it would be or was rendered invalid, under the due process clauses of the Constitutions, because of the mere omission to provide, expressly, for notice and opportunity to be heard before another and superseding assessment by the State Tax Commission should become final and conclusive. The doctrine conducive to this judgment is thus succinctly stated in Manufacturers' L. & H. Co. v. Ott (D. C.) 215 Fed. 940, from which it was recently approvingly reproduced in Ex parte City of Birmingham, 199 Ala. 15, 74 South. 53:

"As the statute is silent on the subject, the presumption is that the Legislature intended the Commission to comply with the Constitution, not to violate it. Such Commissions are under two laws, namely, the statute law of the state, which confers upon them certain powers over public service corporations, and the constitutional law of the state and of the United States, which requires that they shall exercise the powers conferred by statute only by due process of law; that is, after giving the companies due notice and opportunity to be heard, A statute is invalid which requires something to be done which is forbidden by the Constitution, but it cannot be essential to the validity of a statute that it should enjoin obedience to the Constitution."

This manifestly sound doctrine is set down, as upon ample authority in Town of West Hartford v. Coleman, 88 Conn. 78, 89 Atl. 1120–1121.